BenNett, Judge,
delivered the opinion of the court:
This civilian pay case is before the court on cross-motions for summary judgment. Plaintiff suffered two reduction-in-force actions in his Government job, and miscellaneous other difficulties, and now seeks correction of his records and back pay. He claims prejudicial treatment by defendant and states that defendant has improperly applied ill-conceived regulations in reducing his grade and not restoring his position. Defendant denies these allegations and claims to entitlement, says that plaintiff did not timely exhaust necessary administrative remedies on his first RIF and grievance appeal and that the claim based on the second RIF is barred by laches. We conclude, upon a careful review of the pleadings, motions, briefs, many exhibits, and after oral argument, that defendant’s motion should prevail and that the petition must be dismissed.
*671 I
This case turns largely on its facts. We will set forth, here only those necessary to the decision. The chronology is important in this case. Plaintiff, an employee of the Interstate Commerce Commission (ICC) and a classified civil service employee, entered the Government service with ICC in 1956 as a GS-12 and was converted to career status on January 25, 1962. He progressed rapidly and by 1962 was a district director, GS-14, in Kansas City, and in 1964 a regional manager, GS-15, in Chicago. In July 1965 he was transferred to the position of regional manager in San Francisco. Plaintiff claims that his first difficulties arose in connection with this transfer. He moved some of his office furniture from Chicago to San Francisco. Pie claims that he had been granted specific authority to do this at Government expense, but was later reprimanded for it and required personally to pay $105.83 of the transportation costs. He claims that this was also the cause of denial to him of a within-grade salary increase scheduled for January 1966 and that he did not receive the increase until January 1967. Certain temporary restrictions were also placed upon his exercise of authority. The record shows, however, that the furniture incident was but one of several management deficiencies charged against plaintiff in a letter to him from the Managing Director, ICC, on December 10,1965, denying the within-grade salary increase. He was also accused of responsibility for low employee morale in the Chicago region, attributable to his “overly officious and antagonistic attitude” and failure to grasp and solve management problems. The notice of action gave plaintiff 10 days to appeal. He did not appeal.
Following the establishment of the new Department of Transportation, the ICC underwent a reorganization. On March 10, 1967, the Director of Personnel, ICC, advised plaintiff that the ICC had decided that region 6 (Portland) and region 7 (San Francisco) were to be abolished and one region created in their place with headquarters in San Francisco. As a result, his position as regional manager for region 7 was to be abolished, but he would be offered a position as *672 supervisor of car service, GS-14, in Atlanta, effective April 28,1967. While this meant a one-grade reduction plaintiff was assured that there would be no loss in pay and that the reassignment was not to be considered adverse to plaintiff. Plaintiff was further advised that if he did not accept the transfer he would be separated by RIF procedures, effective April 23, 1967. He was told of his right to appeal if he believed the action did not comply with regulations, but that he must do so in writing within 10 days after the effective date of the action, April 28,1967. Plaintiff did not appeal. He accepted the offer of reassignment under date of March 14, 1967. The regional manager from Portland was reassigned to San Francisco. For convenience of reference we will refer to the action reducing plaintiff’s grade, effective April 23,1967, as RIF-1.
On November 14, 1967, plaintiff did institute a “grievance appeal” addressed to the Director of Personnel, ICC, Washington, D.C. In this appeal he requested a hearing and a conference in Washington, D.C. On December 12,1967, plaintiff’s attorney met in conference with the Associate General Counsel, ICC, and discussed the problem generally. No final decisions were reached, but the understanding was that plaintiff would initiate further contact between counsel on the issue of going forward with the appeal and requested hearing.
On January 29,1968, plaintiff was advised by the Director of Personnel that “because of lack of funds and reductions in our budgetary position ceilings” he would be affected by a reduction in force in that all positions in his competitive level were to be abolished. He was offered the position of railroad service agent, GS-12, step 10, at $14,899 per annum, effective March 10,1968. We will call this RIF-2. This RIF meant a reduction in pay from the $19,537 he was currently receiving, and was the first such reduction in pay he had received from the ICC. Plaintiff was instructed that any appeal to the Civil Service Commission must be within 15 days of March 10,1968, the effective date of the action. He accepted the reduction under protest. Plaintiff filed a timely appeal with the Appeals Examining Office of the Civil Service Commission (CSC) and on May 29,1968, the appeal was denied. He then sought *673 review by the CSC Board of Appeals and Review. By decision dated August 30,1968, the board upheld the decision of the Appeals Examining Office. Effective June 2,1968, plaintiff was promoted to GS-13 with an assignment in Kansas City. The salary of the new position was $17,557.
On September 20, 1968, the Director of Personnel, ICC, wrote to plaintiff’s attorney regarding the grievance filed on November 14,1967, concerning BIF-1 and other matters. He stated: “Not having heard from you on this matter since supplying the information you requested on February 12, wc assume that you do not intend to prosecute the case. We are therefore closing the file.” Plaintiff’s attorney wrote in reply, on September 25,1968, that “we do intend to proceed with our grievance and the file should not be closed,” and that he wished to complete the appellate process before the CSC, which involved a loss of salary (KIF-2), “before resuming our prosecution of the grievance appeal.” He stated, further, “we urge that you not mark the file as closed, but retain it in a pending status.” Defendant did not acknowledge the letter of September 25, 1968. From this plaintiff concludes that defendant assented to its request that the grievance claim of November 14, 1967, was being held in a pending status. Defendant, on the other hand, had ruled on the matter and did not consider itself obligated to say that it had not changed its mind, when in fact it had not done so in consideration of plaintiff’s request and advice of September 25.
On February 20, 1969, the CSC Board of Appeals and Review reopened and reconsidered the RIF-2 appeal, but denied it and affirmed the August 30, 1968' decision which was adverse to plaintiff on the March 10, 1968 action which reduced plaintiff’s grade and pay.
On March 27, 1969, plaintiff’s attorney again wrote to the Director of Personnel, ICC. He did not specifically refer to the agency grievance appeal, but rather he sought certain additional personnel records on 10 other employees relating to the March 1968 RIF and plaintiff’s “several appeals” therefrom. He received no response.
Tt was not until almost a year later, February 27,1970, that plaintiff’s counsel again contacted the Director of Personnel *674 to discuss the grievance appeal and he verbally requested a hearing during the month of June but none was promised. On April 7,1970, plaintiff’s attorney, by letter, advised counsel at ICC that the grievance appeal of November 14, 1967, had been stayed while plaintiff’s appeal from RIF-2 of March 1968 was being processed by CSC. He again sought a hearing in June 1970.
On April 17, 1970, the Acting Managing Director, ICC, wrote plaintiff’s counsel in response to his last communication, stating that ICC had cooperated in furnishing information requested from its files on the RIF action before CSC but that, not hearing further regarding the November 14, 1967 grievance letter, had assumed plaintiff did not intend to prosecute it and had advised plaintiff that the file was being closed. Acknowledgment was made that plaintiff had thereafter indicated he did not desire the closing of the file. It was further pointed out to plaintiff’s counsel that, although the Civil Service Commission had denied the RIF-2 appeal on February 20, 1969, no word had been forthcoming from plaintiff until February 27, 1970, and that it was believed such delay in prosecuting the case was contrary to the Commission’s Personnel Manual — Administration, which stated at page 22-729:
* * * If an employee does not furnish required information when requested, or otherwise does not proceed with the advancement of his grievance in a timely manner, the grievance may be terminated without action for failure to prosecute or a decision of resolution may be made. The employee and his representative, if any, shall be notified in writing of the termination or decision on the grievance.
The letter stated further:
It is believed that a basic concern of Mr. Wilmot in November 1967 was his reduction in grade. This matter has been resolved after appeal to the Civil Service Commission. I do not believe other remaining parts of the grievance letter are appropriate to raise for a hearing after all the delay. I therefore deny your request to proceed with a hearing in June and declare the matter closed.
*675 ¡Plaintiff on June 15,1970, asked in an appeal to the CSC Appeals Examining Office that the foregoing determination of the ICC be remanded to that Commission for a full grievance proceeding.
On July 16, 1970, plaintiff was advised regarding this appeal that—
The Civil Service Commission does not accept appeals on grievances unless the grievance relates to an adverse action taken by the agency from which the employee has a right to appeal to the Commission and having appealed to the Commission the appeal was accepted for adjudication.
The ruling identified such matters in the grievance complaint as the claim of plaintiff for reassignment to the position of regional manager, GS-15, from which he had been demoted; administrative refund of expenses assessed against plaintiff for the furniture shipped from Chicago to San Francisco; and correction of records on the latter incident, as matters of agency action which are not appealable to the Commission. It was stated that such an appeal should have been to the General Accounting Office or to the court. The matter was stated to be one within the purview of agency rules for a determination as to whether the administrative remedies had been properly exhausted.
The CSC Board of Appeals and Review, and ultimately the commissioners of CSC, affirmed the foregoing decision. The final decision of the commissioners, dated March 16,1971, stated in part:
* * * we have noted your statement that the appellant was demoted from a GS-15 position to a GS-14 position on April 23,1967, and that this constituted an adverse action. However, the April 23, 1967 demotion was not timely appealed to the Civil Service 'Commission, and was not the subject of the appeal which was decided by the Appeals Examining Office on July 16, 1970, and which was affirmed on October 13, 1970 by the Board of Appeals and Review.
We have also noted your contention that the agency violated its own regulations in processing the appellant’s grievance appeal. However, since a grievance matter is not appealable to the Civil Service Commission, this is *676 not a matter that is subject to appellant review by the Civil Service Commission.
This suit followed on November 26,1971.
II
The first issue to be resolved upon the foregoing facts is whether applicable regulations wore violated by defendant when it did not give plaintiff a hearing on the several issues raised by his grievance appeal of November 14, 1967. The grievance appeal issues included plaintiff’s demand for reassignment to a regional managership, refund of the furniture moving expense paid under protest, correction of plaintiff’s personnel records, and correction of the alleged improper use of the furniture incident to block plaintiff’s right to another GS-15 regional managership. If plaintiff is entitled to a hearing under the facts of the case and the regulations, then he is entitled to a remand instructing that it be held.
In evaluation of this problem there is no question but that plaintiff asked for a heax-ing in his grievance appeal made on November 14,1967. Further, the ICC manual dated January 30,1967, page 22-732, letter No. 61, provides for a hearing and states that it may be denied only “by reasons of extraordinary circumstances.” When a hearing is denied the employee must be advised in writing of the reasons for the denial. It is further established by uncontested facts that no hearing was granted in this case and plaintiff was never advised that one would be granted, although he was advised in writing why it was refused. Further, plaintiff relies on a manual citation, 22-301, which directs that employees demoted through no fault of their own are entitled to consideration for restoration to the same position when it becomes available.- Plaintiff was advised that his March 10, 1967 grade reduction was not considered by ICC as adverse to him. Seven other regional manager positions became vacant in 1967, 1970, and 1971, but they were not offered to plaintiff. These are the alleged procedural defects upon which plaintiff relies to recover under well known, established *677 precedents which consistently hold that where an agency does not follow its regulations, and salary is lost as a result thereof, a right for recovery of back pay is established. Vitarelli v. Seaton, 359 U.S. 535 (1959) ; Service v. Dulles, 354 U.S. 363 (1957) ; Daub v. United States, 154 Ct. Cl. 434, 292 F. 2d 895 (1961) ; Watson v. United States, 142 Ct. Cl. 749, 162 F. Supp. 755 (1958).
Plaintiff’s claim of prejudice by defendant’s actions encounters difficulties at the outset by reason of his delays in making a timely claim as he was instructed to do. First, plaintiff asserts that he was wronged because he was denied a grade increase on January 1,1966, by reason of the furniture incident. He was plainly told by letter of December 10, 1965, as shown above, that if he intended to appeal that matter he should do so within 10 days. He did not appeal.
Next, as heretofore noted, on March 10,1967, when plaintiff was advised that his grade was being reduced from GS-15 to GS-14 and that he was being moved from San Francisco to Atlanta, he was also advised of his right to appeal in 10 days from the effective date of that action, RIF-1, which was April 23,1967. He accepted the reassignment and did not make a grievance appeal until about 7 months later, on November 14,1967. No explanation is given in the record for this delay. He then asked for a hearing, but it was too late. There is an inference in the record that defendant might have waived this failure to proceed in 10 days because it granted a conference to plaintiff’s attorney on December 12, 1967, about the grievance appeal. However, results of that conference were less than definitive so far as the record here goes. The best that can be said is that the parties were willing to engage in further talks but they did not take place. No promise was made to plaintiff that he would get a hearing. Almost 9 months then went by, and on September 20, 1968, plaintiff was advised that the grievance file was being closed because of lack of prosecution thereof. That defendant was entitled to take such action is manifest from the ICC Manual — -Administration, page 22-729, heretofore quoted. Plaintiff protested but his protests were ignored. Defendant stood on its rights and was entitled to do so.
*678 It should be recalled that, in the meantime, effective March 10, 1968, plaintiff suffered his first reduction in pay. He was downgraded to GS-12. This EIF-2 was a serious personal financial blow and it was plaintiff’s judgment that the action should be contested before the Civil Service Commission. Up until March 1968 the November 1967 grievance appeal was still in limbo. One may question whether it ever had a viable existence, since it was filed so late. Plaintiff’s counsel evidently thought it had some viability or tried to give it life by the December 12, 1967 contact with ICC to discuss the need for obtaining information from ICC files. But, we are not shown that he was promised a hearing. The financial blow of March 10,1968, was on an entirely different matter and touched off an entirely different course of events and appeals to the Civil Service Commission, whereas the grievance appeal had been to the ICC. Successive appeals were denied by CSC, and these have been recounted above. Plaintiff urges that he advised ICC that he had not dropped the grievance appeal to that agency but that it was stayed while he pursued EIF-2 before CSC. It is not unreasonable to accept the view that the ICC by its silence did not reject this idea, but the fact is that if it did go along, it eventually lost patience and closed the books in the grievance appeal with finality on September 20, 1968, not having heard from plaintiff about the grievance since December 1967. We have seen that plaintiff on September 25,1968, asked that the ICC not do what it had done.
But, it was not until March 27, 1969, that plaintiff again contacted IOC. We have nothing to show that this related to the grievance appeal. Pie sought personnel data about other ICC employees to use in pursuing appeals regarding the March 1968 EIF-2 he was contesting before the CSC. Eleven months then went by, and all was silent. On February 27, 1970, plaintiff again contacted the ICC about the hearing. We have no explanation for this additional delay. Plaintiff again contacted ICC in March and April 1970 about the elusive hearing, pointing to his own understanding that it was stayed pending CSC review of the action of March 10, 1968, which had resulted in a salary loss, but that when that *679 matter was disposed of it was to be reactivated. It was then that the ICC, on April 17,1970, pointed out to plaintiff that the CSC appeal on RIF-2 was reopened, reconsidered and reaffirmed finally on February 20, 1969, regarding the salary loss matter, and that it had been 1 year between that date and February 27, 1970, when plaintiff’s counsel sought to reactivate his November 1967 grievance appeal. He was told that no grievance hearing should or would be held because of the time delay. The ICC Manual — Administration, page 22-729, was quoted wherein, as heretofore set forth, the Commission was entitled to deny a hearing when a plaintiff does not proceed with the advancement of his grievance in a timely manner.
Plaintiff then took this rebuff to the CSC in successive appeals where he lost upon the advice that the CSC had no authority to accept appeals on grievances unless the grievance related to an adverse action taken by the agency from which the employee has a right to appeal to the Commission. The Commission’s authority to review decisions of other agencies is limited. It is stated in 772 FPM 3-1 that—
The Commission can accept for adjudication appeals from actions taken or decisions made by other agencies only when authority for this kind of appellate review by the Commission is provided by law, Executive Order, or regulation.
The Civil Service Commission has no authority to review agency decisions on grievances. 5 C.F.R. § 771.312 (1974), cf. 5 C.F.R. § 771.229 (1970), says so in these words:
The Commission does not act on a request by an employee for a review of an agency’s action under an agency grievance system.
Nor was the reduction in force an adverse action -as contemplated by 5 C.F.R. § 752.201(b) (1968). The RIF is specifically excluded from the adverse action regulations in 5 C.F.R. § 752.103(b) (3) (1968) and in 5 C.F.R. § 771.205(b) (3) (1968).
Assuming, however, that the regulations do not mean what they say, plaintiff still cannot prevail because of 5 C.F.R. *680 § 351.901 (a) (1968) which, allows an employee not more than 15 days after the effective date of an action to appeal the same, unless the time limit is waived by the Commission. Plaintiff’s grievance appeal of November 1967 was dismissed by the ICC for want of prosecution on September 20,1968. Plaintiff did not go to the CSC about it then. The first time CSC considered this matter was when plaintiff submitted it to the Commission on June 15, 1970, following a further rejection of his demand for a grievance hearing by ICC on April 17, 1970. As for the RIF-1 action which preceded the grievance appeal to ICC, plaintiff did not challenge it before the CSC before the grievance appeal was filed with his agency. We cannot do anything with it now. The 1967 RIF-1 resulted only in a reduction in grade without loss of any salary. That means that it occasions no claim for back pay, the only appropriate action in this court.
It was quite clear all along that plaintiff’s main concern was over the RIF-2 action effective in March 1968, which reduced both his grade and salary. To plaintiff it seems clear that he was not waiving his rights to proceed on the earlier grievances but we are not shown why he could not have pursued all complaints simultaneously. Nothing defendant said or did fairly lulled him into a false sense of security about this. The ICC manual and cited regulations are plain about the need for proceeding promptly and the penalty for undue delay. These requirements were never waived by defendant’s silence to plaintiff’s requests to stay the grievance appeal after defendant had defaulted plaintiff for not proceeding. We have recounted the several significant delays of plaintiff in proceeding both before and after his November 14, 1967 grievance appeal. We cannot find that defendant’s action in defaulting plaintiff was arbitrary or unreasonable under the facts or that it was in violation of any applicable regulation. Those elements of plaintiff’s present case which encompass those stated in his grievance appeal to the ICC are rejected by the court as not sustained by the facts or the law. Plaintiff did not timely exhaust his administrative remedies. There are no mitigating circumstances here for failure to do so. This defect is fatal. Myers v. Bethlehem Shipbuilding Co., 303 U.S. 41 *681 (1938) ; Haynes v. United States, 190 Ct. Cl. 9, 418 F. 2d 1380 (1969) ; Piccone v. United States, 186 Ct. Cl. 752, 407 F. 2d 866 (1969) ; Pine v. United States, 178 Ct. Cl. 146, 371 F. 2d 466 (1967) ; Gernand v. United States, 174 Ct. Cl. 936 (1966).
Ill
We turn now to the RIF-2 action of March 10,1968, which cost plaintiff dearly in lost salary when he was moved from San Francisco to Atlanta and was changed from GS-14 to GS-12. Plaintiff says now that this RIF was improper in that plaintiff’s competitive area and competitive level were unduly restrictive and that excluded from competition with plaintiff was a series of employees whose interchange required that they be at his competitive level.
Plaintiff says that since his competitive level was too narrow, he was prevented from “bumping” individuals in other series designations whose positions he considered to be very similar. Defendant is charged with putting plaintiff in a competitive category where he was virtually- competing with no one but himself. Plaintiff has cited instances in which certain individuals of classification series 1810, 2101, and 2121 were transferred across the series boundaries in reassignments and promotions, and argues that all these individuals should be included in the same classification series and thus compete against each other when released from the competitive level. The general principles for setting competitive levels are contained in the Federal Personnel Manual, chapter 351, sub-chapter 4 — 3. Federal job classifications are determined by duties required and not by the skills of particular individuals assigned to a job. An employee who has adequate skills may qualify for positions in several different classification series. Defendant says that the movements of the individuals cited by plaintiff took place because they happened to meet the qualifications for the positions involved.
The pertinent regulation, 5 C.F.R. § 351.403 (1968), says, in part:
(a) Each agency shall establish competitive levels consisting of all positions in a competitive area and in the *682 same grade or occupational level which are sufficiently alike in qualification requirements, duties, responsibilities, pay schedules, and working conditions, so that an agency readily may assign the incumbent of any one position to any of the other positions without changing the terms of his appointment or unduly interrupting the work program. * * *.
It is the job of the agency to decide what reassignments would unduly interrupt the work program. Courts are properly reluctant to enter into this field of administration. The action of the agency is presumed to be correct, and here we have actions of the ICC which have been reviewed and approved on multiple appeals by the Civil Service Commission. The administrative decisions by those with the special expertise to make them are not only presumed to be correct but will be upset judicially only where it is shown beyond doubt that the discretion vested in the agency officials has been abused or is in excess of their authority, or where the result is unsupported by substantial evidence, or is contrary to law or regulation. Grover v. United States, 200 Ct. Cl. 337 (1973) ; Morelli v. United States, 177 Ct. Cl. 848, 858 (1966) ; Barberi v. United States, 144 Ct. Cl. 573, 577 (1959) ; Bortin v. United States, 133 Ct. Cl. 856, 138 F. Supp. 251 (1956).
In the case before the court, the CSC Board of Appeals and Review (BAR) fully considered and rejected all of plaintiff’s arguments regarding his contention that the competitive level was too narrow. Its decision of August 30,1968, which was subsequently affirmed by the members of the Commission, concluded that under the RIF regulations the agency is not required to look at the incumbent’s qualifications but rather those required by the job’s duties as stated in the official position description. Thus, positions are in the same competitive level only when they require essentially the same knowledge, techniques, and know-how to accomplish job objectives. Accordingly, positions in classification series 1810,2101, and 2121 were held to be completely distinct and different in nature and could not be placed in the same competitive level. The decision stated:
* * * That the agency did in fact reassign Mr. Wilmot from or through several position series appears that *683 they used the positions interchangeably. However, under Civil Service Regulation 335.102 the agency may use its own discretion in promoting, reassigning or transferring employees from one competitive level to another to adjust its work force. Therefore, an employee possessing the required knowledges, skills and abilities for a specific position may be transferred, reassigned or promoted into said position without violating any Civil Service Regulations. This is amply demonstrated by the appellant’s own personnel employment history in that he has been reassigned across competitive levels to different geographic areas of the country on various occasions.
An examination of the record has disclosed that the structure of the competitive level in which Mr. Wilmot’s name appeared is well within the purpose and intention of the Commission’s Reduction in Force Regulations, and the Board so finds.
Plaintiff also submits to the court that his competitive area was so restricted that there was no proper competition and that failure of the CSC to so hold was erroneous as a matter of law.
The Federal Personnel Manual, chapter 351, subchapter 4, section 402, charges an agency to establish competitive areas in which employees compete in reductions in force. Such an area outlines the boundaries of the competition. It must be large enough to permit adequate competition and small enough to be administratively manageable. “A competitive area in the field service meets this standard when it covers a field installation in a local commuting area.” Plaintiff says that he should have been in an area including both the total field service of ICC and Washington, D.C., and that to limit the area to Atlanta, Georgia, where plaintiff was employed, was so narrow as to leave him competing against himself without competition he could bump.
ICC Manual — Administration, page 22-941, defines the competitive area in a RIF as follows:
In the field service the normal competitive area will be the field office in a local commuting area. A local commuting area includes a population center (two or more neighboring ones) and the surrounding localities in which people live and reasonably can be expected to travel back and forth daily from home to work.
*684 In its August 30, 1968 decision the CSC BAR considered plaintiff’s contention but relied on the Federal Personnel Manual, chapter 351, which spelled out that the competitive area need not be larger than the commuting area and that the ICC definition was thus not in error. Under 5 C.F.R. § 351.402 (1968) each agency is to establish competitive areas, the standards are set forth for doing it, and the ICC action here accords therewith. Absent clear abuse of discretion in promulgating or applying such a standard the interpretation thereof is for the Commission and not the courts. Armstrong v. United States, 186 Ct. Cl. 539, 405 F. 2d 1275, cert. denied, 395 U.S. 934 (1969) ; Finch v. United States, 179 Ct. Cl. 1 (1967). It is not hard to imagine the administrative chaos likely to ensue if a competitive area was extended nationwide in all circumstances such as urged here.
Plaintiff argued before the Civil Service Commission additionally that he was improperly reached for separation from his competitive level, that the ICC reassigned four employees from railroad service to motor carrier service during the RIF and that plaintiff was not accorded similar treatment, that at least one appointment was beyond agency authority and that plaintiff had reassignment rights in another competitive area. All issues were fully treated in opinions of the CSC Board of Appeals and Review, and it would contribute nothing to this opinion to discuss them here, as they appear peripheral to plaintiff’s main contentions to the court.
IV
Defendant raises the doctrine of laches as a defense to plaintiff’s claim on RIF-2 of March 10, 1968. Defendant argues that the CSC BAR decision upholding that RIF was rendered on August 30,1968, but plaintiff’s petition was not filed with the court until November 26,1971, almost 39 months later. We note that plaintiff did seek reconsideration of the decision but that the CSC reaffirmed it on February 20,1969. If we use the latter date instead of the one urged upon us by defendant there was a lesser delay of about 34 months to date of filing suit. Where tardiness is shown to have prej *685 udiced defendant, laches has been held to be applicable in less time than the delay here. Norris v. United States, 257 U.S. 77 (1921) ; Arant v. Lane, 249 U.S. 367, 372 (1919) ; Bovard v. United States, 160 Ct. Cl. 619, cert. denied, 374 U.S. 830 (1963) ; Henry v. United States, 139 Ct. Cl. 362, 153 F. Supp. 285 (1957). Prejudice to defendant is manifest from undue delay.
* * * The defense of laches stems from the principle that “equity aids the vigilant, and not those who slumber on their rights,” and is designed to promote diligence and prevent enforcement of stale claims. 2 Pomeroy, Equity Jurisprudence § 418 (5th ed. 1941). To establish the defense the evidence must show both that the delay was unreasonable and that it prejudiced the defendant. [Powell v. Zuckert, 366 F. 2d 634, 636 (D.C. Cir. 1966).]
The Court of Claims has many times said essentially the same thing and has pointed out that there is prejudice to the Government where an illegally discharged employee is given back pay and at the same time another employee who took his place has also been drawing the salary of the position. Of course, there must ordinarily be some showing that this has happened or a demonstration of other prejudice, although the longer the delay in bringing suit the less need there is to search for specific prejudice. Logically, the delay could be so great that the burden of showing lack of prejudice would shift to plaintiff and could be presumed if he did not discharge the burden. Cason v. United States, 200 Ct. Cl. 424, 471 F. 2d 1225 (1973) ; Chappelle v. United States, 168 Ct. Cl. 362, 366 (1964). It may even be presumed, if the delay is unreasonably excessive, that another person has been appointed to the disputed position. Brundage v. United States, ante at 502. But, it is not necessary in the instant case to indulge in any such presumption or to fault defendant for not showing' prejudice more specifically. There are other, sounder grounds for denying plaintiff recovery on RIF-2.
Although plaintiff was inexplicably tardy in bringing suit, one thing that shines through the maze of dates, contentions, argument, and 86 exhibits in this case, is plaintiff’s persistent, *686 vigorous pursuit of administrative appeal to all available levels of the Civil Service Commission which, in turn, considered and reconsidered plaintiff’s contentions about RIF-2. Both the plaintiff and the Commission gave painstaking consideration to the issues on RIF — 2 and later the Commission also considered the appeals on RIF-1 although it held itself to be without jurisdiction on this part of the plaintiff’s case now in court. This court said in Bookman v. United States, 197 Ct. Cl. 108, 116, 453 F. 2d 1263, 1267 (1972) :
The function of a reviewing court in a civil service case such as this is not to “undertake to pass on qualifications of an employee for any given post”, Barger v. United States, 170 Ct. Cl. 207, 214 (1965), nor to determine the proper functions and responsibilities of a particular Government position. Congress has granted the Civil Service Commission broad authority in regard to the classification of Government employees. 5 U.S.C. § 5112 (1970) specifically authorizes the Commission to:
(1) ascertain currently the facts as to the duties, responsibilities, and qualification requirements of a position;
(2) place in an appropriate class and grade a newly created position or a position coming initially under this chapter;
(3) decide whether a position is in its appropriate class and grade; and
(4) change a position from one class or grade to another class or grade when the facts warrant.
These are functions which, by their very nature, require discretionary judgments as to the level of difficulty or complexity of work, and the degree of attendant responsibility. * * *.
* * * We are convinced, after careful review of the record, that plaintiffs have failed to substantiate any abuse of discretion or absence of support for the Commission’s findings. * * *.
The foregoing views have been expressed in other cases both before and since Bookman v. United States, supra. Most recently this position of the court was affirmed in DiRocco v. United States, 201 Ct. Cl. 867 (1973). We believe these views to be dispositive here for we find no abuse of discretion or serious error in the Commission’s careful review of plaintiff’s appeals.
*687 Plaintiff’s motion for summary judgment is denied. Defendant’s motion for summary judgment is granted. The petition is dismissed.