Clifford A. WATSON, Plaintiff,

v.

The UNITED STATES.

No. 164–82C.

United States Claims Court.

April 16, 1986.

June D.W. Kalijarvi, Washington, D.C., for plaintiff; Pamela A. Shea, of counsel.

Jane W. Vanneman, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

This is a civilian pay case which comes before this court on Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment. Plaintiff brings this suit pursuant to 28 U.S.C. § 1491 (1982), alleging that he was improperly demoted by the Agricultural Research Service of the United States Department of Agriculture and that the Merit Systems Protection Board erred in refusing to consider the ARS' failure to provide him with the notice of his appeal rights. Plaintiff seeks restoration of his grade and step level, back pay and appropriate incremental step increases. After a careful review of the pleadings and the submitted papers, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment.

## FACTS

Plaintiff, Clifford A. Watson, is employed by the Agricultural Research Service (ARS) of the United States Department of Agriculture (USDA). Plaintiff's employment with the ARS began on March 6, 1967, as a General Schedule (GS) Grade 13, Step 5, Research Chemist. Plaintiff was assigned to the Market Quality Research Division (MQRD) in Beltsville, Maryland, where he worked for the next 15 months as a research chemist assisting the Chief of the Field Crops and Animal Products Research Branch.

In July 1968, plaintiff was transferred to Manhattan, Kansas where he continued to work as a Research Chemist in the Field Crops and Animal Products Research Branch of the MQRD. At the time of his transfer to Manhattan, Kansas, plaintiff was also designated as the Investigation Leader for the Grain Quality and Sampling Investigations Research Unit (GQ & SIRU). By letter dated May 16, 1969, the Deputy Administrator of ARS designated plaintiff as the Contracting Officer's Designated Representative (COR) for the construction of the Grain Marketing Research Center (GMRC) in Manhattan, Kansas. This assignment was in addition to plaintiff's continuing duties as the Investigation Leader for the GQ & SIRU.

While plaintiff was performing his duties as the COR of the GMRC and the Investigation Leader for the GQ & SIRU, he was evaluated by an ARS Market Quality Research Evaluation Panel (REP) in accordance with the Market Quality Research Evaluation Plan which required evaluation of research personnel every three to five years. On December 18, 1969, the REP recommended that plaintiff be given a classification increase to GS–14. By letter dated January 14, 1970, the Chief of the Crops and Animal Products Research Branch, notified plaintiff of the REP's recommendation, but informed plaintiff that it was the consensus of the committee that for his own personal development he should attempt to have a more active role in research publications so that his name would appear more frequently as junior and senior author on the various publications. In accordance with the REP's recommendation, plaintiff was promoted to a GS–14, Step 3, effective May 17, 1970.

The GMRC was completed in the Spring of 1971 and by letter dated June 7, 1971, Mr. Dean F. Davis, Acting Director of the GMRC, informed plaintiff that his assignment as COR had come to an end. On June 28, 1971, just weeks after the GMRC was completed, plaintiff received a second letter from Mr. Davis designating plaintiff as the new Acting Director of the GMRC, effective July 6, 1971.

In April 1973, the Acting Area Director conducted a Form AD–434 performance evaluation of plaintiff and rated him at 4 (on a scale of 10). On April 25, 1973, plaintiff received his copy of the Form AD–434 performance evaluation along with a letter in which he was counseled to devote more time to his Research Leader role[1] and to develop a strong research program for himself and for the other scientists in his research group and to spend correspondingly less time to the two responsibilities he was discharging on an acting basis.

In August 1973, it was determined that Dr. Yeshajahu Pomeranz would be appointed as the permanent Director of the GMRC. Subsequently, on August 30–31, 1973, the Acting Area Director visited the GMRC. In a memo to plaintiff's file dated September 5, 1973, he noted that during his visit to the GMRC "it was apparent that [plaintiff] had done everything that he could to aggravate the situation in regard to the appointment of Dr. Yeshajahu Pomeranz as Director." In addition, the Acting Area Director noted in his memo that plaintiff had been considered for the position as Director of the GMRC, but that his performance reflected "poor judgment as well as problems reflecting poor research leadership." He visited with plaintiff at the GMRC again on January 3–4, 1974, and discussed plaintiff's performance as Research Leader. In another memo to plaintiff's file dated January 17, 1974, the Acting Area Director stated the following:

> From these discussions on January 3, it was apparent that Dr. Watson really had no plan for his research unit on a program basis. Rather, he seemed to be approaching research for his unit on a "grab bag" basis with relevance and basic approaches reflecting very little depth. There was little evidence of imagination and creativity relating to the efforts of Dr. Watson and his scientists in his research unit and it was apparent that Dr. Watson really had a low level of understanding of what was actually going on in his unit.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Dr. Watson was counseled to stop meddling in administrative matters for which he had no responsibility and that based on the review of his personal research efforts and those of his group that he should be devoting all of his efforts to getting his personal research efforts and those of other members of his research

---

1. The court notes that at the time of plaintiff's May 17, 1970, promotion to GS–14, Step 3, he was designated as being in a "Research Leadership position" although his working title remained as "Investigations Leader." The court also notes that on July 19, 1973 the Regional Personnel Officer, approved a personnel action which reassigned plaintiff from Investigation Leader for the GQ & SIRU to Research Leader.

unit organized and moving on an acceptable basis. Further, that he should develop a program plan for his unit that reflected imagination, creativity and relevance.

Dr. Watson was advised that based on the review of his program that his performance was unsatisfactory.

During the early months of 1974, Mr. Pomeranz, Director of the GMRC, sent a series of letters to plaintiff regarding the publication of several manuscripts and plaintiff's performance as Research Leader. In two letters dated January 8, 1974, Mr. Pomeranz informed plaintiff that the purpose of research agreements was to reimburse the researcher for providing beneficial information to the scientific community and to provide pioneering into new lines of research and not for the purpose of "buying authorship in manuscripts." Furthermore, Mr. Pomeranz stated that adding the name of an ARS researcher to a manuscript to which he had made no contribution was professionally unethical. In a letter to plaintiff dated February 22, 1974, Mr. Pomeranz stated: "To the best of my knowledge, the only change that you made prior to sending out the manuscript for peer review, was to retype the title page on which you added your name...." In another letter to plaintiff dated February 26, 1974, Mr. Pomeranz stated:

> This may be presumptious [sic] on my part, but I surmise that Mrs. Loyd and I have spent more time in reviewing the manuscript and making suggestions for improvement than the time you have spent in preparing the revised draft. This is a marginal manuscript.... The least you should do ... is to prepare the reasonably best manuscript for submission to the scientific editor and reviewers.

By letter dated March 4, 1974, Mr. Pomeranz informed plaintiff that his performance was "unsatisfactory." The letter states:

> You have failed to develop a comprehensive research program plan for your unit that reflects imaginative and creative approaches to immediate and long-term rel-evant objectives and goals. The research output in both quality and quantity for your unit is substantially below the expected minimum for the large investment in facilities, personnel, and operating funds.

Subsequently, on April 25, 1974, plaintiff was informed by Mr. Pomeranz that the GQ & SIRU would not continue to function as a separate unit and that its personnel would be assigned to other units in the GMRC. Consequently, plaintiff was removed, officially and organizationally, as Research Leader of the GQ & SIRU. On July 23-24, 1974, plaintiff was again evaluated by a REP which evaluated his research accomplishments in accordance with the evaluation plans for ARS scientific positions. Although the REP recognized that plaintiff had assumed many duties which adversely affected his efforts as a research leader and research scientist, it also considered plaintiff to have had "sufficient opportunities in his broad assignment to establish, organize, and conduct a viable research program which would be expected to result in a number of significant contributions to the basic and applied research in the cereal grain area." The REP concluded that the research conducted by plaintiff was lacking in creativity and had a limited impact on the grading, marketing, and processing of cereal grains and that the quality and quantity of the research performed by plaintiff and his leadership of his research unit were below that expected at the GS-14 level. Accordingly, the REP recommended that plaintiff be retained in his present grade subject to a one-year review, but noted that unless there was significant evidence of improved performance, plaintiff could be evaluated at less than a GS-14 which might result in an action to downgrade his position.

By letter dated August 16, 1974, from Paul J. Fitzgerald, Assistant Deputy Administrator, ARS, plaintiff was notified of the REP's decision and recommendation to retain him in his present grade subject to a one-year review. Subsequently, on August 27, 1974, plaintiff's supervisor, Mr. Pomer-

anz, visited with plaintiff regarding the REP's findings and recommendations. At this meeting, plaintiff requested that Mr. Pomeranz determine the specific areas where the REP considered him deficient and whether the REP had given adequate consideration to his duties as the COR and Acting Director of the GMRC as well as his responsibilities for administering extramural research activities.

In response to Mr. Pomeranz' inquiry for the information requested by plaintiff the Assistant Area Director of the ARS sent a letter dated September 12, 1974 to Mr. Pomeranz stating that the REP had given adequate consideration to plaintiff's other duties, but concluded that even with those additional administrative duties, plaintiff had "sufficient opportunity in his broad assignment to assume leadership in some significant phase of the total grain marketing research area." The letter also stated that the REP's review of plaintiff's research indicated that he had been the lead author on only a few papers in scientific journals and other semi-technical and popular items and that his career as a research scientist indicated a "pattern of a lack of depth and creativity of personal input into significant research problems at the level expected of a research scientist."

On October 3, 1974, plaintiff sent an appeal to the Director of Personnel, USDA, contesting each point of the REP's evaluation. On October 4, 1974, plaintiff also filed an informal grievance with the Deputy Administrator of the North Central Region, ARS. On November 14, 1974, after a discussion of his grievance with a representative of the North Central Region, plaintiff withdrew his informal grievance. This conversation was confirmed in writing by plaintiff's memorandum to the Deputy Administrator of the North Central Region, ARS, dated November 18, 1974.

Before plaintiff filed his October 3, 1974 appeal with the Personnel Officer, plaintiff received a notice of reassignment to the Hard Red Spring and Duram Wheat Quality Laboratory in Fargo, North Dakota, effective October 29, 1974. After plaintiff's reassignment became effective and he had moved to Fargo, North Dakota, plaintiff telephoned the Chief of the Employee Appeals Division, ARS, and discovered that the Employee Appeals Division had not received plaintiff's October 3, 1974 appeal. Therefore, on January 29, 1975, plaintiff sent four copies of his October 3, 1974 appeal to the Chief of the Employee Appeals Division, ARS. The appeal was in four parts, i.e., (1) that the REP's evaluation was erroneous, (2) that his reassignment to Fargo, North Dakota was improper, (3) that his removal from Research Leader was improper, and (4) that he was treated unfairly in his assignment as Acting Director of the GMRC. On February 10, 1975, plaintiff was informed that his appeal had been referred to the ARS for processing.

By letter dated May 21, 1975, the Director of Personnel, ARS, responded to each of plaintiff's four complaints as follows: (1) plaintiff's complaint regarding the REP's decision had been accepted as a classification appeal, (2) plaintiff's complaint regarding his reassignment to Fargo, North Dakota had been referred to the ARS for appropriate action, (3) plaintiff's complaint of his removal as Research Leader had also been referred to the ARS for appropriate action, and (4) plaintiff's complaint of unfair treatment in connection with his assignment as Acting Director of the GMRC could not be accepted as a formal grievance until informal processing had been pursued.

Subsequently, on June 2, 1975, plaintiff requested some information and clarification. By letter dated June 9, 1975, the Director of Personnel, ARS, responded to plaintiff's clarification request by informing plaintiff that the part of his complaint regarding the REP's decision could not be considered as a classification appeal because he was not contesting his "present classification or grade" or the "coverage of [his] position under the General Schedule pay system," and that because there had "been no adverse classification action, no basis exist[ed] for a classification appeal."

In addition, plaintiff was informed that if he wished to pursue this portion of his complaint, he could have it considered in the form of a grievance. Plaintiff was also informed that the part of his complaint regarding unfair treatment in connection with his assignment as Acting Director of the GMRC could be reviewed under the Department's Grievance Procedures, but that this portion of his complaint must be processed initially as an informal grievance. Accordingly, on June 16, 1975, plaintiff filed an informal grievance with the Deputy Administrator, ARS, reiterating three parts of his original complaint *i.e.*, (1) that the REP's decision was erroneous, (2) that his removal as Research Leader was improper, and (3) that he was treated unfairly with regard to his position as Acting Director of the GMRC.

By letter dated September 22, 1975, the Director of Personnel informed plaintiff that after a review of his informal grievance, there was no finding of any improper actions regarding any of plaintiff's grievances and that there would be no further administrative action taken by the North Central Region in response to his informal grievance. He strongly urged plaintiff that it would be "best for all concerned" if plaintiff would "wipe clean the slate from [his] previous assignment and start fresh with [his] assignment at Fargo." However, he also informed plaintiff that if he was not satisfied, he could file a formal grievance within seven days. After receiving an extension of time to file his formal grievance and discussing his grievance with various staff members of the Personnel Division (to no avail), plaintiff filed a formal grievance with the Director, Personnel Division, ARS, on December 3, 1975,

covering essentially the same issues as in his informal grievance.

On March 17, 1976, the Administrator, ARS, informed plaintiff of his proposed disposition of plaintiff's formal grievance. The Administrator concluded that the 1974 REP findings were not unfair. He further concluded that plaintiff's removal from his Research Leader position, and his concurrent reassignment, was a reduction-in-force (RIF) and should have been accomplished through RIF procedures. Furthermore, the Administrator advised plaintiff that the North Central Region had already initiated corrective procedures to properly accomplish this reassignment by RIF procedures.[2] Subsequently, on April 2, 1976, plaintiff wrote to the Administrator and stated that he did not accept the proposed disposition and requested that the grievance be assigned to a Grievance Examiner. In addition, plaintiff alleged that the time taken to process the grievance appeared to be an improper application of rules and regulations and further requested that the Grievance Examiner investigate this as a further grievance.

By letter dated April 15, 1976, plaintiff was informed that the material was being furnished to a Grievance Examiner for further review. Plaintiff was also informed that if he wanted to have the Grievance Examiner investigate as a further grievance the delay in processing his initial grievance, he should notify the Agency within 15 days. By letter dated April 26, 1976, plaintiff indicated that he was still dissatisfied, but that he was not filing a separate grievance over the timeliness in processing his initial grievance. However, plaintiff requested that his grievance not be considered untimely in view of the long

**2.** During the interim period between September 22, 1975, and the filing of the formal grievance on December 3, 1975, personnel officials in ARS concluded that plaintiff's reassignment to Fargo had not been effected in accordance with proper procedures and initiated corrective action. Consequently, plaintiff was issued a RIF notice on January 9, 1976, which informed him that his position in Manhattan, Kansas was abolished, effective February 27, 1976, and offered plaintiff the position of Research Chemist GS–

14 in Fargo, North Dakota—the position he had actually occupied and had been performing since October 29, 1974. The RIF notice informed plaintiff of his rights of appeal to the Civil Service Commission (now the Office of Personnel Management) and was signed by Mr. Herman H. Meyners, Regional Personnel Officer, ARS. By memorandum to Mr. Meyners dated February 23, 1976, plaintiff accepted the assignment to Fargo, but noted that he believed the RIF notice to be "improper."

time that had been taken to process the entire matter. The grievance file was subsequently referred for the assignment of a Grievance Examiner.

On June 1, 1976, plaintiff was furnished with a copy of the Grievance file with the opportunity to comment on it. Plaintiff responded by letter dated June 8, 1976, and requested either a hearing or at least some further inquiry. After further review of the grievance file the grievance examiner determined that a hearing was not necessary but that further inquiry would be conducted of ARS officials regarding certain aspects of the grievance. This inquiry was initiated on August 17, 1976. Plaintiff also initiated his own inquiry on August 25, 1976.

Subsequently, on March 15, 1978, the Grievance Examiner sent his findings and recommended decision to the Administrator, ARS, recommending that: (1) no further corrective action be taken covering plaintiff's removal from his position as Research Leader; (2) no further consideration be given to plaintiff's allegations of unfair treatment as Acting Director of the GMRC, and (3) the REP's 1974 evaluation be upheld. By letter dated March 22, 1978, plaintiff was informed by the ARS that the recommended decision had been adopted as the ARS' final decision on plaintiff's formal grievance filed December 3, 1975.

During the interim, while plaintiff was proceeding through the grievance process, he was again evaluated by a REP on February 4–5, 1976, which recommended that plaintiff be demoted to a GS–13 grade.[3] Subsequently, plaintiff received a memorandum of proposed demotion from the Regional Personnel Officer, ARS, which informed plaintiff that based upon the REP's evaluation, it was being proposed that plaintiff be changed from a Research Chemist, GS–14, to a Research Chemist, GS–13. The memorandum outlined the reasons for the proposed demotion and indi-

cated that the REP's determination that plaintiff was performing at the GS–13 grade level was based on the criteria set forth in the Research Grade Evaluation Guide (RGEG) and the Supplemental Handbook for Using the RGEG in the ARS. Plaintiff was informed that his performance was evaluated on the basis of four factors from the RGEG *i.e.*, Factor I—Research Assignment; Factor II—Supervision Received; Factor III—Guidelines and Originality; and Factor IV—Qualifications and Scientific Contributions). Furthermore, plaintiff was informed that the REP's rating was as follows: Factor I—6 points; Factor II—6 points; Factor III—4 points; and Factor IV—10 points. This resulted in a total of 26 points which equated to a performance at the GS–13 grade level.[4]

Plaintiff objected to the proposed demotion in a written response and an oral response on July 12 and 13, 1976, respectively to the Regional Personnel Officer, ARS. Plaintiff directed his responses to the designated official to hear plaintiff's oral reply. By letter dated July 16, 1976, that official recommended to the Deputy Administrator, ARS, that plaintiff be re-evaluated by a new REP. By a memorandum dated August 4, 1976 and a separate memorandum dated August 5, 1976, the Regional Classification Officer, responded to plaintiff's oral and written responses. In these responses, which were directed to the Deputy Administrator, the Regional Personnel Officer concluded that a re-evaluation of plaintiff with a new REP was inappropriate and that the 1976 REP decision to demote plaintiff to a GS–13 should stand because no ARS or CSC procedure had been violated.

On September 10, 1976, the Deputy Administrator issued his decision rejecting the recommendation that plaintiff be re-evaluated by a new REP and concluded that plaintiff's demotion was warranted and justified. Consequently, plaintiff was demot-

---

**3.** This evaluation was conducted pursuant to the 1974 REP recommendation that plaintiff be retained in his present GS–14 grade subject to a one-year review.

**4.** According to the RGEG, the total points required for a position to be graded at the GS–14 level was between the range of 36 to 42 points and at the GS–13 level, from 26 to 32 points.

ed from his position as research Chemist, GS–14, Step 6 to a Research Chemist, GS–13, Step 8, effective September 26, 1976. He also informed plaintiff that he had the right to appeal his demotion as either a classification appeal or as an adverse action appeal. Plaintiff chose to make it an adverse action appeal and, accordingly, on September 20, 1976, filed an appeal with the Chief Appeals Officer, Denver Field Office, Federal Employee Appeals Authority (FEAA), CSC.[5] Subsequently, on September 29, 1976, plaintiff wrote to the FEAA and stated his belief that he had been removed from Research Leader by an adverse action which was appealable. Plaintiff requested that this issue become a part of his appeal to the FEAA dated September 20, 1976.

After a hearing on November 15 and 16, 1976, the FEAA requested an advisory opinion from the Personnel Management and Evaluation Division (PMED), CSC, concerning the correct grade of plaintiff's position (i.e., number NC1326). On February 22, 1976, the Chief of the PMED, CSC, issued an advisory opinion concluding that "position number NC1326, Research Chemist, GS–1320–13, [was] correctly classified." In making this determination, the CSC utilized the RGEG and found that "Factors I, II, and III were creditable at Degree C, granting six points each, or a subtotal of 18 points," and that Factor IV was credited at Degree B resulting in an additional eight points, for a total of 26 points which "convert[ed] marginally to GS–1320–13 by reference to the grade determination chart provided in the guide."

In a memorandum to the FEAA dated March 10, 1977, plaintiff and a Research Leader from the ARS jointly disagreed with the CSC's advisory decision classify-ing plaintiff as a GS–1320–13. In this memorandum, plaintiff contended that the CSC's decision should be rejected by the FEAA because plaintiff's position should have been classified as a GS–14 because the proper score for plaintiff's evaluation under the four RGEG factors should have been a "score of 42 and possibly a 46, but the minimum of 40, which is a very satisfactory GS–14." On March 17, 1977, the FEAA requested the CSC to evaluate these comments directed towards the CSC's February 22, 1977 advisory opinion. On May 9, 1977, the CSC responded to the FEAA's request concluding that position number NC1326 was correctly classified as a Research Chemist, GS–1320–13 and that there was no basis for modifying its earlier opinion. However, the CSC made it clear that it was not attempting to rate plaintiff's performance and that its opinion was in no way meant to assess plaintiff's personal ability, the manner of his performance, or the quality of his work; but was limited to the accuracy of the classification determinations of the position in question.

On May 27, 1977, the FEAA rendered its decision on plaintiff's appeal of October 3, 1974 making the following conclusions: (1) the ARS complied with the required procedures in effecting the plaintiff's demotion; (2) plaintiff's position was properly classified as Research Chemist, GS–13; and (3) plaintiff did not pursue, with due diligence, the ARS' actions taken in 1974 and therefore those allegations would not be adjudicated.

On July 13, 1977, plaintiff wrote to the Chairman, Appeals Review Board, CSC, and requested that the appeal of his demotion, decided by the Denver Office, FEAA, be reopened and reconsidered pursuant to 5 C.F.R. § 772.310.[6] After determining that

---

5. The FEAA is now the Merit System Protection Board (MSPB).

6. Section 772.310 of the Civil Service regulations permits the Commission's Appeals Review Board, in its discretion and notwithstanding the exhaustion of the right of appeal or the pendency of suit, to reopen and reconsider any previous decision of an appeals officer when the party requesting reopening submits written ar-gument or evidence which tends to establish that:

(1) New and material evidence is available that was not readily available when the decision of the appeals officer was issued;

(2) The previous decision of the appeals officer involves an erroneous interpretation of law or regulation, or a misapplication of established policy; or

the regulatory criteria set forth in section 772.310 had been satisfied, the Board informed plaintiff on December 1, 1978, that it had decided to reopen and reconsider his appeal. Subsequently, on December 29, 1979, plaintiff's case was transferred to the new MSPB.

On March 19, 1979, the MSPB requested the OPM to provide another advisory opinion as to whether the evaluation provided by the Denver Regional PMED correctly applied the appropriate standards. After analyzing plaintiff's position under the four factors in the RGEG (*i.e.,* Factor I—Research Assignment; Factor II—Supervision Received; Factor III—Guidelines and Originality; and Factor IV—Qualifications and Scientific Contributions), the OPM issued its advisory decision on May 3, 1979, concluding that plaintiff's position was correctly classified as a Research Chemist, GS–1320–13. Persuaded by the analysis of the OPM's advisory decision and the entire appellate record, the MSPB affirmed the decision of the PMED on June 3, 1981.

### DISCUSSION

Based on the above facts, plaintiff filed a Petition in this court on March 29, 1982, contending that he was entitled to a restoration of his grade and step level, back pay, and appropriate incremental step increases on two grounds. First, plaintiff contended that his rights were violated because neither the ARS, CSC, nor the MSPB graded his position by comparison to the appropriate standards. Second, plaintiff contended that his rights were violated because the ARS failed to provide him with a notice of his appeal rights pertaining to his reassignment and transfer and because the CSC and the MSPB subsequently failed to consider the issue.

■ It is well settled that this court may set aside an administrative action only if it is found to be arbitrary, capricious, or an abuse of discretion, unsupported by substantial evidence, without a rational basis, contrary to law, or not in substantial compliance with procedural regulations. *Brewer v. United State Postal Service,* 227 Ct.Cl. 276, 279, 647 F.2d 1093, 1096 (1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982). In reviewing the ARS' administrative action, the court makes its determination solely on review of the documentary record, and will not consider evidence produced for the first time in a court proceeding where such evidence was available during administrative review. *Brousseau v. United States,* 226 Ct.Cl. 199, 210, 640 F.2d 1235, 1242 (1981); *Leefer v. United States,* 215 Ct.Cl. 1061, 1062, 578 F.2d 1388 (1978).

### I. *Demotion Claim*

■ Pursuant to its authority under Section 401 of the Classification Act of 1949, the CSC issued the RGEG in June of 1964. The RGEG was intended for use "in determining grade levels of research positions." The basic premise of the guide is that the qualifications of an incumbent can greatly expand a given research position in depth and in scope and that the qualifications of an incumbent are directly proportional to the demonstrated research accomplishments of that incumbent. Thus, the guide uses a point evaluation system embodying a man-in-the-job concept through which the qualifications, contributions, and professional standing of the incumbent are considered directly in the evaluation process. This man-in-the-job concept recognizes that "research positions inherently require creativity and originality because the purpose of the research is to extend man's knowledge and understanding." The ARS uses the criteria published in the RGEG in conjunction with a peer review Research Evaluation Panel to determine the appropriate grade level for research chemists. Consequently, the reclassifications are not based entirely upon a reassessment of the responsibilities entailed, rather, they are based partly on whether the performance of the incumbent in the job is sufficient to support the grade level classification.

---

(3) The decision of the appeals officer is of a precedential nature involving new or unre- viewed policy considerations that may have effect beyond the case at hand.

Plaintiff contends that since 1967 his position has been classified as a non-research position and that he was not expected to do research. Consequently, plaintiff alleges that the ARS' use of the RGEG was inappropriate in their classification evaluation which led to his demotion because of the administrative nature of his responsibilities. The court disagrees.

The record is clear that since 1967 plaintiff has had a research job description and was officially classified as a research chemist. Plaintiff's initial assignment upon employment in 1967 stated that he was responsible for "coordinating, planning, evaluating and conducting research problems in grain investigations" and that he was to manifest a "high degree of initiative, resourcefulness and judgment" in performing these duties. In 1968, plaintiff's assignment in Manhattan was substantially the same. In fact, plaintiff, in drafting his revised job description, expanded and clarified his responsibilities in his research assignment, and specifically stated his responsibilities were as follows:

[T]he incumbent conducts and directs research on: (1) quality evaluation, and developing objective measurements of quality in grains and their products; (2) developing or improving devices or instruments for sampling and for objective quality evaluation of agricultural products that can be used for standardizing, inspecting, grading and other action programs of C&MS, ASCS, industries, and others; and (3) the maintenance of quality during processing, storing, transporting and handling of grains.

* * * * * *

He conceives independently and draws up original programs of research to be followed and problems to be investigated.

* * * * * *

The incumbent is responsible for selection of problems, defining objectives, selection of research approaches, conduct of the research, interpretation of results and expenditures of funds within his investigations.

It seems evident from this research assignment drafted by plaintiff himself that plaintiff considered his responsibilities to be primarily research and not administrative in nature. The court finds it interesting to note that in drafting this research assignment, plaintiff uses three headings i.e., I. Assignment; II. Supervision Received; and III. Supervision & Leadership, the first two of which are identical to the first two factors used in the RGEG for evaluating an incumbent in his job.

The fact that plaintiff was classified as a research chemist is clear not only from his official classification papers but from repeated formal and informal warnings from his supervisors to devote more time to his personal research programs and less time to administrative matters. As early as December 1969, seven years before his demotion, ARS began to encourage plaintiff to have a more active role in his research efforts in order to benefit his own future development. At the time plaintiff was appointed COR during the construction of the GMRC, the ARS informed plaintiff that this assignment was to be in addition to his research assignment and that he should continue his research functions as Investigation Leader of the GQ & SIRU. When ARS designated plaintiff as Acting Director of the GMRC in June 1971, he was again informed by ARS that this assignment was in addition to his research assignment and that he would be expected to continue to carry out his assigned research responsibilities.[7]

In January 1974, plaintiff met with his supervisor and was counseled to "stop meddling in administrative matters for which he had no responsibility and that based on the review of his personal research efforts and those of his group that he should be devoting all of his efforts to getting his personal research efforts and

---

7. The court believes that it is possible for one man to effectively perform two full-time jobs simultaneously but believes ARS must be extremely naive if it thought that neither job would suffer because of the other. There are, after all, only so many hours in a day.

those of other members of his research unit organized and moving on an acceptable basis." During plaintiff's grievance proceedings, testimony was heard that the administrative assignments given to plaintiff were not unusual for a GS–13 or GS–14 research chemist and that they did not prohibit or severely restrict research. He further testified that ARS expected a GS–14 scientist to effectively handle such a combination of research and administrative assignments. The grievance examiner similarly concluded that plaintiff's administrative duties were not atypical of administrative responsibilities performed by research scientists in leadership positions. In addition, the February 1974 REP reviewed plaintiff's work in detail and concluded that even with his administrative duties plaintiff had "sufficient opportunities to establish and conduct a viable research program." Finally, in recommending plaintiff's demotion, the North Central Regional REP concluded that plaintiff was performing on the lowest level of the GS–13.

On February 22, 1979, the PMED issued the first of its two advisory opinions. In the process of determining the correct grade of plaintiff's position, the PMED stated that it reviewed information in the appeal file "pertinent to the process of deciding the correct occupational series, title and grade" of plaintiff's position. After analyzing the various requirements of the position, PMED concluded that it involved research and was therefore correctly classified at the GS–1320 chemistry series. After determining that plaintiff's position was a research position, the PMED, pursuant to the RGEG, concluded that the appropriate grade level was a GS–13. In its second advisory opinion, the PMED reviewed the "entire file" for "information pertinent to the classification process," and again concluded that plaintiff's position was correctly classified as a Research Chemist, GS–13. Relying heavily upon the PMED's two advisory opinions, the FEAA rendered its decision in May 1977, concluding that ARS had properly applied the RGEG ·and that plaintiff's position was properly classified at a GS–13.

After plaintiff's case was reopened for reconsideration, the OPM in its May 1979 advisory opinion to the MSPB concluded that the PMED had correctly applied the RGEG standards and had correctly classified plaintiff's position as a GS–13. Subsequently, on June 3, 1981, the MSPB issued its decision affirming plaintiff's demotion. In reaching this conclusion, the MSPB stated that it was "persuaded by the analysis of OPM's Classification Review Division" and that "based on this analysis and the entire appellate record," it affirmed plaintiff's demotion.

Given the clear, comprehensive and detailed record, the court is convinced that there was enough substantial evidence to sustain the decision of the MSPB. After an extensive review of the entire record, this court holds that the actions of the MSPB were not arbitrary, capricious, contrary to law, nor an abuse of discretion. Accordingly, the decision of the MSPB insofar as it relates to plaintiff's demotion claim is affirmed.

## II. *Reassignment Claim*

The plaintiff also contended that the CSC and MSPB erred in refusing to consider his allegation that the ARS' failure to provide him with notice of his appeal rights pertaining to his reassignment and transfer violated certain of his rights. Defendant argued that this court does not have jurisdiction over this separate and distinct claim. The court agrees with defendant.

The jurisdiction of this court is grounded in 28 U.S.C. § 1491 (1982) which gives this court jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."

In *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court held that this statute is purely jurisdictional, and in order for a plaintiff to invoke the jurisdiction of this court, there must first exist a substantive right to recover money damages from the

United States. *Id.* at 398, 96 S.Ct. at 953. The *Testan* ruling has been consistently followed by this court. *See e.g. Dunn v. United States Department of Agriculture,* 228 Ct.Cl. 129, 654 F.2d 64 (1981) and *Price v. United States,* 224 Ct.Cl. 58, 621 F.2d 418 (1980).

■ Plaintiff's claim that the CSC and MSPB erroneously refused to consider his allegations regarding the 1974 reassignment and alleged RIF does not present a claim for presently due money damages. The plaintiff may have experienced a reduction in relative rank within his grade as a result of the reassignment, but he did not receive a reduction in pay. Because the 1974 reassignment did not result in any decrease in salary, the plaintiff's allegation that the CSC and MSPB erroneously refused to consider his reassignment grievance does not present a claim over which this court would have jurisdiction. *See Wilmot v. United States,* 205 Ct.Cl. 666 (1974) which held that the Court of Claims lacked jurisdiction over a RIF that resulted only in reduction in grade and not in salary.

■ Plaintiff argues, however, that this court may adjudicate the reassignment claim under the doctrine of pendent jurisdiction, which provides that a court with jurisdiction over one claim may exercise jurisdiction over a related claim even though jurisdiction over the latter would not ordinarily exist. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Pendent jurisdiction, however, is a doctrine of discretion, not of plaintiff's right, and is justified by considerations of judicial economy, convenience and fairness to litigants. *Id.* at 726, 86 S.Ct. at 1139. The plaintiff contends that these considerations argue strongly in favor of the court's exercise of pendent jurisdiction over the reassignment and RIF claim. The court disagrees. It would not be judicially economical for this court to consider pendent claims that fall clearly outside the court's limited jurisdiction. Furthermore, plaintiff has not adequately shown that the refusal to exercise pendent jurisdiction over the reassignment claim

would result in inconvenience or unfairness. In fact, plaintiff's only allegation is that the second research evaluation panel in 1976 considered his reassignment as a negative factor in evaluating his performance at the GS–13 grade. This mere allegation is not enough to support the conclusion that the denial of jurisdiction would result in inconvenience or unfairness, especially in light of the court's previous determination that the 1976 re-evaluation and demotion were supported by substantial evidence and were not arbitrary and capricious.

### CONCLUSION

After a careful review of the entire record, the court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Cross-Motion for Summary Judgment. Accordingly, the clerk is directed to dismiss the Complaint. No costs.

IT IS SO ORDERED.