Roy S. DIAMOND, Gerald Leavitt, Richard A. Keefe and Peter S. Zouvas

v.

The UNITED STATES.

No. 462–79C.

United States Court of Claims.

Aug. 19, 1981.

---

Harold A. Liebenson, Chicago, Ill., Atty. of record, for plaintiffs. John W. Mug, Jr., Chicago, Ill., of counsel.

Kenneth R. Melvin, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant. Robert Leong, Dept. of Housing & Urban Development, Chicago, Ill., of counsel.

Before NICHOLS, BENNETT and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This matter is before the court on defendant's motion for summary judgment, which we grant without oral argument. The action is brought by sponsors of and investors in an aborted multifamily housing project in Chicago, Illinois. The project is identified as the LaSalle-Oak Apartments, FHA Project No. 017–32070 PM. Plaintiffs allege that the Department of Housing and Urban Development (HUD) engaged in arbitrary, capricious, and unreasonable conduct in its processing of the project's application for FHA mortgage insurance. The proposal never progressed beyond the commitment stage and never proceeded to endorsement because the sponsors were held to have failed to meet applicable regulatory and statutory requirements.

The project was a substantial one to consist of 1,386 apartment units costing approximately $47 million. It was to be financed by secured loans of approximately $40 million. Plaintiffs and their lender sought a commitment from HUD for the full insurance of this loan under section 220 of the National Housing Act of 1934, 12 U.S.C. § 1715k (1976). In event of default of the mortgagor, the secured lender would thus have recourse to an insurance claim against the United States under the terms of the federal mortgage insurance contract.

The first step in obtaining federal mortgage insurance is in the pre-application stage where the proposal is examined by HUD to find out whether the project would be economically feasible by production of sufficient income to pay operating and fixed project expenses, meet the mortgage requirements, and leave a fair net return to the developer.

If found to be economically feasible, the developer and lender may apply for a commitment for project mortgage insurance. At this point, the developer must submit the proposal in more complete detail. If the commitment is forthcoming, there may be an endorsement of the mortgage note for the insurance. 24 C.F.R. § 207.251(e) (1973). This "initial" endorsement binds HUD to insure amounts advanced by the lender during the construction phase. 24 C.F.R. § 207.254(a) (1973). A second and "final" endorsement takes place when the project is completed and the final total insurable mortgage amount can be determined. 24 C.F.R. § 207.254(b) and (c) (1973).

If a commitment is given, HUD is required to endorse the mortgage both initially and finally, provided various conditions

have been met as set forth in the commitment. If those conditions are not met, the commitment expires on a fixed date. In this case, the proposal progressed to the issuance of a commitment date, April 18, 1973, which was amended July 9, 1974. The proposal did not come to initial endorsement, however, because plaintiffs did not fulfill the conditions precedent in the commitment. After a series of seven extensions and 20 months, plaintiffs were still unable to meet their obligations, so the commitment for insurance was allowed to expire on December 8, 1975.

Plaintiffs' claim of an abuse of discretion by defendant in processing this matter is based on HUD's action requiring:

(1) an "initial operating deficit" deposit of $1,962,630;

(2) contract drawings within an unreasonable period of time;

(3) unnecessary appointment of a supervisory architect;

(4) evidence of financing rates, discounts, fees and source;

(5) additional fees for an increase in the insured mortgage amount.

Plaintiffs allege that these processing actions were contrary to HUD's past operating standards and cost plaintiffs large sums of money and they pray for damages of $9 million. Plaintiffs seek denial of defendant's motion and desire a trial.

The first defense asserted to this claim is that we have no jurisdiction of it. Citing *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967), the Supreme Court in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), declared that where "the plaintiff is not suing [the United States] for money improperly exacted or retained, the basis of the federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself * * * can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" 424 U.S. at 401–02, 96 S.Ct. at 954–55.

Defendant says that plaintiffs do not allege a breach of contract by defendant. Had there been a breach, it would have been with the lender, arising from refusal to pay the insurance in the event of a default by plaintiffs on their mortgage note. But, the project failed before HUD endorsed any note. Further, plaintiffs do not claim that money is owed them under any law; nor do they allege a violation of the Constitution, the National Housing Act, or HUD regulations. Instead, plaintiffs claim damages based upon alleged arbitrary and abusive exercises of administrative discretion by HUD in allowing the Commitment for Insurance of Advances to expire on December 8, 1975. Defendant says that this case cannot be equated to those of unsuccessful bidders who make similar allegations and where the court has accepted jurisdiction. We agree with defendant.

In 1979, nearly 3 years after initiation of this action, the defendant moved the United States District Court for the Northern District of Illinois, where the action was first brought in 1976, to transfer the case to the Court of Claims on the grounds we had exclusive jurisdiction of the claim. The district court did so. Now defendant says that we have no jurisdiction.

The question of jurisdiction is therefore encountered at the threshold here. The defendant's objection to the district court's jurisdiction, which prevailed, was along the line that the consent to suit plaintiff relied on, 12 U.S.C. § 1702 (1976), which authorizes the Secretary to sue and be sued in any court, did not consent to suits such as the instant one which sought money recovery, not against the Secretary's separate funds under his control, but against the general funds of the U.S. Treasury. Upon getting the suit transferred here, defendant again moved for dismissal, and relies in its brief on alleged want of jurisdiction, which might appear at first blush as a reprehensible whipsawing of the plaintiff. Yet upon analysis of the position, what defendant really is saying now is that jurisdiction is lacking here except so far as plaintiff can

claim on a contract implied in fact and, with respect to that, the claim is defective and must be dismissed on the merits. If defendant is right so far, the transfer is not a mere futility. Defendant obtains an adjudication on the merits which will have *res judicata* effect and dispose of the claim against it once and for all. In the very similar case of *Tree Farm Development Corp. v. United States*, 218 Ct.Cl. 308, ——, 585 F.2d 493, 501 (1978), we concluded:

> Since there is no implied-in-fact contract on the facts of this case or under the principles of *Heyer* and its progeny, the court lacks jurisdiction to consider plaintiff's claim. * * *

This is a conclusory way of saying and really says: We have considered the only aspect of the case of which we have jurisdiction, the allegation of a contract implied in fact, and have determined that there was no contract implied in fact. In any other way of looking at the claim, we lack jurisdiction of it.

One may be sure the court would not have penned 14 pages about a case it had no jurisdiction of at all. And so here, defendant would fail in its obvious purpose in obtaining the transfer here if it obtained from us a decision that said we lacked jurisdiction and stopped there.

■ The plaintiff says the district court's order effects a collateral estoppel to the effect that we do have jurisdiction, but there is nothing in the district court's order to show how it thought we had it, and if we have jurisdiction only as founded on an alleged contract implied in fact, that is not contrary to the district court's position. So, the order cannot be read as broadening our jurisdiction to cover anything else, supposing it capable of having that effect. We must decide our own jurisdiction, however, and cannot have it conferred on us by any other court. *Thompson Tower Ltd. Dividend Housing Ass'n v. United States*, Ct.Cl. No. 253–80C (order entered July 10, 1981); *Berdick v. United States*, 222 Ct.Cl. ——, 612 F.2d 533 (1979). We have jurisdiction of the instant claim so far as it is founded on the asserted existence of a contract implied in fact, and lack jurisdiction of it so far as it might be founded on any other theory.

■ We turn now to plaintiffs' core contention that they had a legal relationship with defendant which committed the latter to provide the mortgage insurance but that it arbitrarily and unlawfully set up conditions, after making the commitment, which deliberately made it impossible for plaintiffs to comply. The five major examples plaintiffs give to undergird this contention have been set forth above. These alleged offenses are said to have arisen because the agency made determinations without adherence to any agency standards which either did not exist or, where they did exist, were not applied to plaintiffs as they were to others. Plaintiffs especially protest being caught by alleged surprise with a requirement that they put up almost $2 million in cash, instead of by promissory note," for an "initial operating deficit deposit." When plaintiffs did not put up the deposit, the commitment was terminated and the project collapsed. Plaintiffs say that this was an entirely irrational and unreasonable requirement fatal to defense of their claim.

We believe that the key to resolution of this dispute is the formal commitment itself which has been provided as an exhibit to the plaintiffs' petition. This is a lengthy document with much fine print, signed by the parties, and setting forth the requirements of defendant, including one for termination unless plaintiffs complied with the requirements in the stated time. One of the detailed schedules made a part of the commitment is entitled "Total Requirements for Settlement." It lists the "initial operating deficit" of $1,608,600. This commitment of April 18, 1973, was amended on July 9, 1974, to increase the initial operating deficit payment required for settlement to $1,962,630.

The Commitment for Insurance of Advances agreed to and signed by the parties provides in its opening paragraph:

> The Federal Housing Commissioner, acting herein on behalf of the Secretary of Housing and Urban Development, will

endorse for insurance under the provisions of Section 220 of the National Housing Act, and the Regulations thereunder now in effect, a mortgage note * * * to be secured by a mortgage * * *. The insurance endorsement will be subject to compliance with the requirements of the Regulations, and the terms and conditions set forth below. * * *

In paragraph 3(j)(4), it is further provided:

The Mortgagor shall establish to the Commissioner's satisfaction that, in addition to the proceeds of the insured mortgage, the Mortgagor has funds in the amount of * * * [$1,608,600.00 in the original commitment; $1,962,630.00 in the amended commitment], or has made financial arrangements acceptable to the Commissioner in order to meet the expenses of the project from the date of initial occupancy until twelve months after the date of final endorsement as the Commissioner estimates is necessary to establish a profitable operation. The funds shall be deposited with the Mortgagee or other depository acceptable to the Commissioner on or before the date of initial endorsement, * * *

The above-cited provisions are explicit commitment conditions precedent to initial endorsement of the mortgage note. It is undisputed that the conditions were not met prior to termination for failure to meet them. Plaintiffs were given seven extensions and 20 months to comply. They point out that some other sponsors and mortgagors were not required to put up so much money, especially cash, and this is true. However, as the language makes clear, the Commissioner had complete discretion to determine what would be proper in any given case. We cannot say that he abused that discretion here. This was a very large project. The sponsors had difficulties with their financing and three different potential mortgagees were involved and the sponsorship itself changed its composition three times. Given the instability of the operation, including the tentative commitment of the lenders, the spiraling costs, the scope of defendant's risk, and the effort to increase the mortgage to be insured from

approximately $45 million to $55 million, it does not seem unreasonable that defendant would insist that the project be demonstrably viable prior to defendant's assumption of risk.

The parties held numerous meetings to resolve their difficulties and defendant insisted that plaintiffs also provide additional contract drawings, a supervisory architect, additional financial information, and certain additional fees which plaintiffs felt were unnecessary and unreasonable. However, these issues are peripheral to plaintiffs' central complaint that they were not on notice that substantial sums would be required at closing. The initial letters to plaintiffs in 1972, inviting them to submit an application for a commitment, put them on notice that several million dollars would be so required, including money for potential operating deficits. Plaintiffs' amended application, resulting in the amended commitment for insurance, dated July 9, 1974, acknowledges the necessity of the substantial requirement to cover anticipated initial operating deficits. Finally, the language of the commitment itself, quoted above, says as to the $1,962,300 to cover the estimated initial operating deficit, "The funds shall be deposited * * * on or before the date of initial endorsement."

Defendant did not make these requirements lightly. Indeed, it reevaluated them before they became final. Yet, it was justly concerned that, unless the project—one of great magnitude—was substantially filled soon after its completion, there would be a negative cash flow until some point in future time when the level of occupancy reached a point that would furnish an income adequate to meet fixed expenses. The cash requirement for an initial operating deficit deposit was based on a reasonable assumption that a negative cash flow would occur, and upon a prediction of the extent of the deficit. Unless prudent action was taken to anticipate this situation, it could have resulted in large financial losses to defendant. We find no legal error in what defendant did although it is possible that we might have handled the details

somewhat differently had that been our responsibility. But, it is not our duty to second-guess the administrators in a matter of this kind, except where it is shown that their discretion was so abused and their regulations and the statutes so flouted that serious legal error requires a reversal of their actions. We are not persuaded that is the situation here, nor do we find any contract implied in fact. *Tree Farm Development Corp. v. United States, supra.*

Defendant's motion for summary judgment is granted. The petition is dismissed.