**CARLYLE GARDENS COMPANY, Plaintiff,**

v.

**DELAWARE STATE HOUSING AU-THORITY and the Secretary of Housing and Urban Development, Defendants.**

**Civ. A. No. 85–11–JLL.**

United States District Court,
D. Delaware.

April 28, 1987.

Nicholas H. Rodriguez and William W. Pepper of Schmittinger and Rodriguez, Dover, Del., and Joseph Burstein, Washington, D.C., for plaintiff.

Daniel M. Kristol and Wendie E. Cohen of Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Del., for defendant Delaware State Housing Authority.

William C. Carpenter, Jr., U.S. Atty., and Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., and Peter M. Campanella, Ann E. Harrison, and Sharon Marsha Matthews-Swain, U.S. Dept. of Housing and Urban Development, Region III, Philadelphia, Pa., for defendant Secretary of Housing and Urban Development.

LATCHUM, Senior District Judge.

## I. INTRODUCTION

Plaintiff Carlyle Gardens Company ("plaintiff") originally filed this action in the Court of Chancery for the State of Delaware against defendant Delaware State Housing Authority ("DSHA") alleging that DSHA breached its Housing Assistance Payment Contract with the plaintiff by wrongfully reducing plaintiff's Section 8 housing assistance payments. (Docket Item ["D.I."] 1 at Exhibit ["Ex."] A.) DSHA removed the case to this Court and immediately moved to join the Secretary of Housing and Urban Development ("the Secretary") as a necessary party to this litigation. (D.I. 5.) While DSHA's motion was pending, the parties entered into a stipulation providing that DSHA would dismiss its motion in exchange for the plaintiff amending its complaint to join the Secretary as an additional defendant. (D.I. 9.) Pursuant to that agreement, the plaintiff amended its complaint alleging the same claim against DSHA in Count One, but adding a Count Two against the Secretary alleging that the Secretary directed DSHA to reduce the plaintiff's housing assistance payments in contravention of Section 8 of the United States Housing Act. (D.I. 10.)

Presently before the Court are the parties' cross motions for summary judgment. (D.I. 24; 31.) The plaintiff requests summary judgment against both defendants alleging that no genuine issue of material fact exists as to its entitlement to the housing assistance payments. (D.I. 26.) DSHA and the Secretary request that this Court deny plaintiff's motion and instead grant their cross motions for summary judgment or dismiss plaintiff's complaint on jurisdictional grounds.[1] (D.I. 27; 28.) For the reasons stated below, this Court holds that it lacks the subject matter jurisdiction to decide this case and will thus decline to decide all of the parties' motions for summary judgment and will transfer this case to the Claims Court.

## II. FACTS PERTINENT TO THESE MOTIONS

Carlyle Gardens is a 112–unit housing complex located in Dover, Delaware. (D.I.

---

1. DSHA made a request for summary judgment in its letter brief in opposition to the plaintiff's motion for summary judgment. (D.I. 28.) However, DSHA has not filed a motion for summary judgment. Nonetheless, DSHA has moved to dismiss the plaintiff's claim for failure to state a valid claim (D.I. 4 at 3), and the Court may treat that motion as a motion for summary judgment.

10 at ¶ 1.) Although the complex is currently in the process of being sold pursuant to a foreclosure order issued by this Court in a related case,[2] at all times relevant to this case, Carlyle Gardens was owned and operated by the plaintiff. (*Id.*)

Since its construction, Carlyle Gardens has participated in HUD's housing assistance program for existing housing under Section 8 of the United States Housing Act ("USHA"), 42 U.S.C. § 1437f (1978). (D.I. 10 at ¶ 1.) Under this program, the Secretary provides housing assistance to low and moderate income families.

The mechanics of the program are as follows. A Public Housing Authority ("PHA"), such as DSHA, applies to the Secretary for funds to supply its client population with rental assistance. The Secretary then executes an Annual Assistance Contract ("ACC") with the PHA obligating the Secretary to provide funds to the PHA so the PHA can provide housing assistance to the eligible families. 24 C.F.R. § 882.-104(a) (1987). After receiving the Secretary's obligation, the PHA issues certificates of participation to the eligible families, who lease rental units directly from any owner they wish as long as the units meet with the Secretary's approval. *Id.* at 882.102; 882.103(a). Once a unit is chosen, the PHA enters into a Housing Assistance Payment ("HAP") contract with the owner of that unit obligating the PHA to provide housing assistance payments to the owner on behalf of the eligible tenants. *Id.* at 882.102.

The parties are in agreement as to the following facts. Carlyle Gardens was classified into a special subcategory of Section 8 housing known as existing recently completed housing. (D.I. 27 at 7; 29 at 5.) The existing recently completed housing program permitted PHAs to pay owners of eligible projects additional rents for units being leased by Section 8 eligible tenants where construction or substantial rehabilitation of the units was completed no more than six years prior to execution of the HAP contract between the PHA and the owner. (D.I. 27 at 5; 29 at 7.) The higher

rent levels remained in effect beyond the six-year period until such time as the family which occupied the unit in the sixth year was either no longer in occupancy or no longer receiving Section 8 payments. (D.I. 27 at 5; 29 at 8.)

One of the parties' disagreements centers around the number of units still eligible for the higher rents. The Secretary maintains that during one of HUD's routine examinations of the plaintiff's file, he discovered that the plaintiff was receiving the higher "recently completed" rents for 12 units which were no longer eligible for those rents since the tenants had moved in after the six-year eligibility period expired. (D.I. 27 at 7.) The plaintiff insists that all of the units for which it was receiving the higher rents were occupied by tenants who moved in before the six-year period expired. (D.I. 26 at 5.)

The more significant disagreement between the parties centers on the question of whether DSHA was permitted to authorize higher rents at Carlyle Gardens without prior HUD approval. The plaintiff contends that any rent increases it received was pursuant to the "automatic rent adjustments" it was entitled to as a recently completed project. (D.I. 26 at 4.) The Secretary does not dispute that the plaintiff adhered to the regulations under Section 8 in obtaining the rent increases. (D.I. 35 at 28.) However, the Secretary maintains that the plaintiff was obligated under a separate HUD program in which the plaintiff also participated, the Mortgage Insurance Program, to seek prior HUD approval before obtaining any rent increases. (*Id.*) This the plaintiff failed to do.

Under the Mortgage Insurance Program, 12 U.S.C. § 1707–1715 (1980), the Secretary is authorized to insure mortgages on multifamily rental housing projects for low and moderate income families. The owner of the project obtains the mortgage from a lending institution with the understanding that the Secretary will satisfy that mortgage obligation in the event the owner defaults. This insulates the lending insti-

**2.** *United States v. Wennik,* 645 F.Supp. 103    (D.Del.1986).

tution from any financial risk in lending the project money and thus enables projects such as Carlyle Gardens to obtain loans where they otherwise could not have. In consideration of the mortgage insurance, the owner executes a regulatory agreement which governs the operation of the project.

The Secretary insured the mortgage and note covering the Carlyle Gardens project. (D.I. 27 at A–6.) Pursuant to the regulatory agreement entered into by the Secretary and the plaintiff, the Secretary was authorized to set the rents charged by the plaintiff and require that the plaintiff submit all proposed rent increases to him for approval. (*Id.*)

Thus the Secretary's argument basically is that the plaintiff complied with its obligations under the Section 8 housing assistance program but failed to comply with its contractual duty under the mortgage insurance program to get prior HUD approval for any rent increases. In response, the plaintiff maintains that the provision of the regulatory agreement requiring prior HUD approval on rent increases was repealed by the Secretary in 48 Fed.Reg. 16,670 (1983) (to be codified at 24 C.F.R. pts. 207, 220, 221 and 236) (April 19, 1983). (D.I. 35 at 21.) The Secretary maintains that this repeal was not self-executing and that each project must apply to the Secretary for a rescission of the requirement in its regulatory agreement that HUD approve all rent increases. (D.I. 35 at 16.)

### III. ANALYSIS

Because this Court can render a decision on the merits only if it has proper jurisdiction, the Court must first consider two jurisdictional arguments advanced by the Secretary. First, the Secretary contends

that the plaintiff's claim against him ("federal claim") is in reality a claim against the United States and is thus barred by the doctrine of sovereign immunity. (D.I. 27 at 9–10.) Second, the Secretary claims that if a waiver of that immunity does exist with regard to the plaintiff's federal claim, it can be found only in the Tucker Act, 28 U.S.C. §§ 1346, 1491 (1973 & 1976), which vests exclusive jurisdiction for suits of this nature in the Claims Court. (*Id.* at 10–13.)

The plaintiff offers the same argument in response to both of the Secretary's contentions. The plaintiff insists that its federal claim is against the Secretary, not the United States, and thus is neither barred by the doctrine of sovereign immunity, nor within the exclusive jurisdiction of the Claims Court under the Tucker Act. (D.I. 29 at 11–14.)

For the reasons stated below the Court agrees with the Secretary's second argument and will therefore transfer the plaintiff's federal claim to the Claims Court pursuant to the Tucker Act.

### A. *Sovereign Immunity*

It is fundamental that the United States, as sovereign, is immune from suit absent its expressed waiver of that immunity. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). This defense is jurisdictional and a suit may not be maintained unless a waiver is found. *Mitchell,* 463 U.S. at 212, 103 S.Ct. at 2965.

The plaintiff maintains that section 502(b) of the USHA, 42 U.S.C. § 1404a, ("§ 1404(a)"), waives any immunity with respect to its federal claim.[3] (D.I. 29 at 13.)

**3.** Section 1404a authorizes the United States Housing Authority (now HUD) to "sue or be sued" with respect to its functions under the United States Housing Act of 1937. 42 U.S.C. § 1404a (1978). Plaintiff's amended complaint names the Secretary, not HUD, as the federal defendant. (D.I. 10.) However, plaintiff may still rely on section 1404a. Because all of the functions of HUD have been embodied in the person of the Secretary, 42 U.S.C. § 3534 (1977), courts treat section 1404a as authorizing suits

against both the Secretary and HUD. *See, e.g., Portsmouth Redevelopment & Hous. Auth. v. Pierce,* 706 F.2d 471 (4th Cir.1983); *Jemo Associates v. Greene Metro Hous. Auth.,* 523 F.Supp. 186 (S.D.Ohio 1981); *Ippolito-Lutz, Inc. v. Harris,* 473 F.Supp. 255 (S.D.N.Y.1979). For basically the same reason, the Supreme Court has held that section 1 of the National Housing Act, 12 U.S.C. § 1702 (1980), which authorizes the Secretary to "sue or be sued" with respect to his functions under that Act, also

Section 1404a authorizes the United States Housing Authority (now the Department of Housing and Urban Development [HUD]) to "sue or be sued" with respect to its functions under the USHA. 42 U.S.C. § 1404a. Courts have construed this section, and the parallel sue or be sued clause contained in section 1 of the National Housing Act ("NHA"), 12 U.S.C. § 1702 (1980), ("§ 1702"), to be limited waivers of sovereign immunity applying only to suits against HUD or the Secretary but not to suits against the United States.[4] *Falls Riverway Realty v. City of Niagara Falls*, 754 F.2d 49, 55 (2d Cir.1985); *Lomas & Nettleton Co. v. Pierce*, 636 F.2d 971, 973 (5th Cir.1981); *Marcus Garvey Square v. Winston Burnett Constr.*, 595 F.2d 1126, 1132 (9th Cir.1979); *Jemo Assoc. v. Greene Metro Hous. Auth.*, 523 F.Supp. 186, 187 (S.D.Ohio 1981).

■ The plaintiff's amended complaint names the Secretary, not the United States, as the federal defendant. (D.I. 10.) However, the nominal classification a plaintiff attaches to his opposing party is not dispositive of sovereign immunity questions. *Doe v. Civiletti*, 635 F.2d 88, 93 n. 13 (2d Cir.1980). Rather, courts will look at the nature of the relief requested when deciding if a suit is actually against the Secretary or in reality a suit against the United States. *Id.* A suit is against the Secretary if the judgment sought could be paid out of separate funds in his possession and control, severed from treasury funds or control, *Falls Riverway Realty*, 754 F.2d at 56; *Industrial Indem. Inc. v. Landrieu*, 615 F.2d 644, 646 (5th Cir.1980); *Marcus*

*Garvey Square*, 595 F.2d at 1131, while suits which seek funds out of "the public treasury or domain" must be treated as against the United States. *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1013, 91 L.Ed. 1209 (1947).

■ In the case at bar, the plaintiff seeks $12,075 in Section 8 housing assistance payments which it claims DSHA wrongfully withheld at the Secretary's request. (D.I. 10 at ¶ 11, prayer for relief.) DSHA receives the funds for such payments from HUD under its annual contributions contracts with HUD. *See* 42 U.S.C. § 1437f (1978). There is no doubt that the funds necessary to meet HUD's obligations under its ACCs originate in the public treasury and must be appropriated to the Secretary by Congress. *See* 42 U.S.C. § 1437c(c)(7)(B) (1978). *See, e.g.,* Appropriations Act of 1982, Pub.L. 97–101, 95 Stat. 1417–1418, 1436 (1981). However, once the money has been appropriated, the Secretary places the funds for certain assistance programs, including the Section 882 program involved here, in a reserve account, "established and maintained by HUD in a specifically identified and segregated account." 24 C.F.R. § 882.104(b) (1987). Hence the question becomes: Do funds which originate in the public treasury but are put into a separate account once appropriated, constitute separate funds so that a suit for those funds must be treated as against the Secretary or do such funds retain their nature as public funds even after being appropriated so that a suit for those funds is one against the United States?

---

applies to HUD. *FHA v. Burr*, 309 U.S. 242, 250, 60 S.Ct. 488, 492–93, 84 L.Ed. 724 (1940). Thus these provisions are virtually interchangeable for our purposes.

4. The Court finds this terminology somewhat confusing. Referring to sections 1404a and 1702 as limited waivers of immunity applying only if a suit is against the Secretary and not the United States implies that the Secretary possesses immunity in suits against him which are not suits against the United States. However, the rule has always been that public officials are only immune when sued in their official capacity, and the suit is in reality against the United States. *Doe v. Civiletti*, 635 F.2d 88, 93 n. 13 (2d

Cir.1980); *Unimex v. United States Dep't of Hous. and Urban Dev.*, 594 F.2d 1060, 1062 (5th Cir.1979). A strict reading of these rules would mean that the Secretary is immune only if the suit is actually against the United States in which case sections 1404a and 1702 would not apply to waive that immunity. However, if the suit is against the Secretary alone, and not treated as against the United States, the Secretary has no immunity and sections 1404a and 1702 apply to waive immunity which does not exist. But this is only a matter of semantics and the bottom line remains that this suit is cognizable under section 1404a or 1702 only if it is against the Secretary and not the United States.

■ There appears to be a split in the Circuits regarding this question. One line of cases can be read for the proposition that treasury funds put into separate accounts once appropriated do constitute separate funds. *See, e.g., Industrial Indemnity,* 615 F.2d at 646; *SS Silberblatt Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 36 (2d Cir.1979).[5]

In *Industrial Indemnity,* the Fifth Circuit was faced with this identical legal issue. The plaintiff in that case, a general contractor who had constructed a HUD insured low income housing project, sued the Secretary for the remainder of its construction fee after the owner of the project defaulted and the mortgage was assigned to HUD. The Secretary raised the immunity issue and the plaintiff responded by asserting the limited waiver of immunity contained in section 1702.

Following the same legal principles set out above by this Court, the Fifth Circuit examined the fund from which a judgment in that case would come to determine if the fund was a separate fund in the control of the Secretary. *Industrial Indemnity,* 615 F.2d at 646. The fund at issue was the General Insurance Fund ("GIF") established by 12 U.S.C. § 1735c (1980). The GIF is a revolving fund in the control of the Secretary used to finance HUD's mortgage insurance program. *Id.* at 1735c(a). The GIF obtains most of its working capital from the proceeds of the mortgage insurance program which it funds. *Id.* at 1735c(d). However, to the extent that these proceeds are insufficient to sustain the fund, Congress must appropriate additional sums to the GIF from the public treasury. *See id.* at 1735c(f). *See, e.g.,* 95 Stat. 1419 ($2,280,640 appropriated in 1981 alone to cover the losses sustained by the GIF and the Special Risk Insurance Fund). Thus the GIF is analogous to the fund in the case at bar since both funds originate to a large extent in the public treasury but are kept in a separate account once appropriated.

The Fifth Circuit held that the GIF constitutes a separate fund in the exclusive control of the Secretary and that the suit was therefore against the Secretary. *Industrial Indemnity,* 615 F.2d at 646. Since the suit was against the Secretary, the Court applied the limited waiver of immunity contained in section 1702 and entertained the suit. *Id.*

The Second Circuit reached a similar conclusion in *SS Silberblatt.* The judgment sought in that case was payable out of a fund similar to the GIF, the Special Risk Insurance Fund ("SRIF"). *See* 12 U.S.C. § 1715z–3 (1980). Like the GIF, the SRIF is a separate fund which derives much of its capital from the proceeds of the mortgages it insures. *Id.* at 1715z–3(b). But Congress must also appropriate substantial amounts from the public treasury to cover the losses sustained by the SRIF. *See id. See, e.g.,* 95 Stat. 1419. Despite this fact, the Second Circuit found the SRIF to be a separate fund and applied the section 1702 limited waiver. *SS Silberblatt,* 608 F.2d at 36.

In apparent opposition to these cases is the Fourth Circuit's opinion in *Portsmouth Redevelopment and Hous. Auth. v. Pierce,* 706 F.2d 471 (4th Cir.1983). The plaintiff in *Portsmouth* was a PHA who sued the Secretary over a dispute concerning its ACC with HUD. Any judgment recovered from the Secretary would be paid out of the ACC account the Secretary establishes to fund its low income housing assistance programs pursuant to 42 U.S.C. § 1437c. As discussed above in reference to the case at bar, the money for HUD's ACC obligations originates in the public

---

5. At oral argument, the plaintiff cited the Seventh Circuit's decision in *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981), to support its position that the funds it seeks are separate funds. (D.I. 35 at 5.) That case held that funds put into a separate account to fund HUD's ACC obligations under the housing assistance program in 24 C.F.R. Part 886, constitute an "identifiable res" upon which an equitable lien may be imposed. 643 F.2d at 1275. Thus, *Holbrook* is not directly on point in that it did not deal with the sovereign immunity issue presently before this Court. However, even if *Holbrook* can be read for the proposition that treasury funds, once appropriated and placed in a separate account, do constitute separate funds for sovereign immunity purposes, the case should be considered in the *Industrial Indemnity* and *SS Silberblatt* line of cases and the Court's discussion of those cases applies to it.

treasury but is put into separate accounts by the Secretary once appropriated.

The Fourth Circuit held that a suit for those funds must be treated as against the United States. *Portsmouth,* 706 F.2d at 474. Unpersuaded by the fact that the funds are stored in separate accounts once appropriated, the Fourth Circuit stated: "There is no separate fund for the payment of operating subsidies within HUD's exclusive control, 'the origin of which [is] not the public treasury.' The funds appropriated to HUD for the payment of operating subsidies clearly originate in the public treasury, and they do not cease to be public funds after they are appropriated." *Id.* at 473–74 (citations omitted). Since the suit was in reality against the United States, the *Portsmouth* court refused to apply the waivers contained in sections 1404a or 1702. *Id.*

From the above, it is clear that the circuit courts disagree as to the proper resolution of this issue. Absent any guidance from the Third Circuit as to which view is the more reasoned, this Court must decide on its own which rule to follow. After a careful consideration of the above cited cases, the Court has chosen to follow the *Portsmouth* decision.

*Portsmouth* is much closer factually to the case at bar than are *Industrial Indemnity* or *SS Silberblatt.* Both *Portsmouth* and this case involve suits for money used to finance HUD's commitments under its ACCs with local PHAs. That money comes from the public treasury, *see* 42 U.S.C. § 1437c(c)(7)(B). *See, e.g.,* 95 Stat. 1417, and is put into separate accounts by regulation, once appropriated. *See* 24 C.F.R. 881.503(b); 882.104(b); 886.108(b). The GIF and SRIF at issue in *Industrial Indemnity* and *SS Silberblatt* respectively differ from the ACC funds in two important respects. First, the GIF and SRIF receive some of their funding from sources other than the treasury. *See* 12 U.S.C.

§§ 1715z–3(b); 1735c(d). Second, the GIF and SRIF are established as separate funds by statute, not regulation. *See* 12 U.S.C. §§ 1715z–3(b); 1735c(a).

More important than the factual difference, the Court finds *Portsmouth* to be the better reasoned decision. The *Industrial Indemnity* and *SS Silberblatt* line of cases purport to rely on the Supreme Court's decision in *FHA v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940) to support their holdings. However, this Court agrees with Judge Keeton of the District of Massachusetts that to the extent these cases hold that public funds appropriated under the Housing Act become separate funds once appropriated, they go far beyond *Burr. See Armor Elevator Co. v. Phoenix Urban Corp.,* 493 F.Supp. 876, 883 (D.Mass.1980), *aff'd,* 655 F.2d 19 (1st Cir.1981).

*Burr* held that a creditor of an FHA employee could garnish that employee's wages in the possession of the FHA. *Burr,* 309 U.S. at 250, 60 S.Ct. at 492–93. Thus, the recovery in *Burr* was limited to funds used to pay an employee's wages, money the FHA already was obligated to pay that employee. The judgment in *Burr* did nothing to enlarge the FHA's liability in any way. It simply changed the identity of the person receiving the check. Permitting a plaintiff to recover funds from the GIF, SRIF or ACC reserve accounts is a different matter, however. If the funds contained in those accounts must be used to satisfy a judgment against the Secretary, they must be diverted from the purposes for which they were originally appropriated. If those purposes are to be achieved, additional public funds must be appropriated to replace those funds paid out in satisfaction of that judgment.

Thus, unlike the judgment in *Burr,* the judgment in *Industrial Indemnity* and *SS Silberblatt* eventually affected the public treasury.[6] Recognizing that the same

---

**6.** By contrast, if a fund is truly separate and does not receive appropriations from the public treasury, additional amounts would not have to be appropriated from the treasury to replace any monies paid from that fund to satisfy a

judgment. Thus neither Judge Keeton in *Armor Elevator,* nor this Court, question the validity of the general rule that suits for funds truly in the control of the Secretary, which did not have their origin in the public treasury, constitute

thing would occur if a judgment was granted out of funds in the ACC accounts, the *Portsmouth* court held the suit to be against the United States and applied the immunity doctrine. The Court believes this to be the better view.

■ Based on the above analysis, the Court will follow *Portsmouth* and will hold that the suit herein is in reality against the United States. As such, the limited waiver of immunity contained in section 1404a does not apply and suit in this Court is barred by sovereign immunity.

## B. *The Tucker Act*

■ The Secretary suggests that the only waiver of immunity applicable to the plaintiff's federal claim is contained in the Tucker Act, which vests exclusive jurisdiction over suits of this nature in the Claims Court. (D.I. 27 at 10–12.) The Court agrees.

The Tucker Act contains both a waiver of sovereign immunity, *Mitchell*, 403 U.S. at 212, 103 S.Ct. at 2965, and a grant of subject matter jurisdiction. *Hahn v. United States*, 757 F.2d 581, 586 (3d Cir.1985). The Act grants concurrent jurisdiction to the district court and the Claims Court over claims against the United States not exceeding $10,000, founded upon the Constitution, any act of Congress, regulation, or expressed or implied contract to which the United States is a party. For claims of this nature in excess of $10,000, the Tucker Act vests exclusive jurisdiction in the Claims Court. 28 U.S.C. §§ 1346, 1491; *Hahn*, 757 F.2d at 585–86. Thus, in order for a suit to be within the exclusive jurisdiction of the Claims Court under the Tucker Act, it must be: (1) against the United States; (2) founded upon the Constitution, an act of Congress, regulation, or expressed or implied contract with the United States; and (3) for an amount in excess of $10,000.

This Court has previously held that the plaintiff's federal claim must be treated as against the United States. Thus the first criterion is met.

Plaintiff's federal claim also satisfies the second criterion. Plaintiff contends that the Secretary wrongfully directed DSHA to withhold a portion of plaintiff's housing assistance payments in contravention of the United States Housing Act of 1937 and the federal regulations contained in 24 C.F.R. Part 882. (D.I. 10.) Whatever the merits of plaintiff's federal claim, it is clear that it is based on both a statute and federal regulations and thus the second criterion is met.

Finally, the plaintiff's amended complaint requests $12,075.00 in monetary relief and a declaratory judgment that it is entitled to the higher rents as existing recently completed housing.[7] (D.I. 10 & prayer for relief). This establishes the third criterion that the relief sought be in excess of $10,000.

Based on the above, this Court concludes that jurisdiction over the plaintiff's federal claim lies exclusively in the Claims Court under the Tucker Act.

## C. *Transfer*

■ Having determined that jurisdiction over the plaintiff's federal claim is not proper in this Court, exclusive jurisdiction over that claim lying in the Claims Court, this Court must either dismiss that claim for want of jurisdiction, or transfer it to the Claims Court. In the interest of justice and to promote judicial economy, the Court will transfer the plaintiff's federal claim to the Claims Court as authorized by 28 U.S.C. § 1631 (1987).

The only issue left to be decided in this case is the disposition of count one of the plaintiff's amended complaint alleging a

---

separate funds so that a suit for those funds is against the Secretary only. Instead, the disagreement lies with *Industrial Indemnity's* and *SS Silberblatt's* application of this rule to funds which originate in the public treasury and must be replaced by treasury funds if paid out in satisfaction of a judgment.

**7.** The plaintiff's request for an injunction is now moot since the property is being foreclosed upon pursuant to this Court's earlier order.

claim against DSHA. The most attractive alternative would be to transfer that count to the Claims Court as well, enabling the Claims Court to decide the entire case. However, it is uncertain whether the Claims Court possesses jurisdiction to hear the claim against DSHA, and such jurisdiction is a prerequisite to a transfer to the Claims Court. 28 U.S.C. § 1631.

The Claims Court is a court of extremely limited jurisdiction. *Pinkston v. United States*, 6 Cl.Ct. 263, 265 (1984). The plaintiff's claim against DSHA does not fall directly within the narrow scope of that jurisdiction. However, that claim is so integrally tied to plaintiff's federal claim that the Claims Court might be able to entertain it under a theory of ancillary or pendent jurisdiction.

Although this Court's research failed to uncover any cases in which the Claims Court exercised ancillary or pendent jurisdiction over a claim such as this, there is some authority for the proposition that these doctrines do apply to Claims Court litigation. *See Grasso v. United States*, 438 F.Supp. 1231, 1235 n. 4 (D.Mass.1977); *Watson v. United States*, 9 Cl.Ct. 763, 774 (1986). The Court in *Grasso* transferred a claim against the Postal Service, along with a claim against the United States, to the Claims Court. After concluding that the claim against the Postal Service was arguably within the Claims Court's original jurisdiction, the Court stated:

> Even if the Court of Claims does not have original jurisdiction over the Postal Service, the case seemingly presents an appropriate circumstance for that Court's ancillary or pendent jurisdiction over the claims against the Postal Service. The Court of Claims has exclusive jurisdiction over claims against the United States and therefore is the only forum where all the claims may be tried together.

*Grasso*, 438 F.Supp. at 1235 n. 4.

The Claims Court itself indicated that pendent jurisdiction is available in its cases in *Watson v. United States*. Citing the Supreme Court's decision in *United Mineworkers v. Gibbs*, 383 U.S. 715, 86 S.Ct.

1130, 16 L.Ed.2d 218 (1966), the *Watson* court recognized that pendent jurisdiction is justified in some cases by "consideration of judicial economy, convenience and fairness to the litigants." *Watson*, 9 Cl.Ct. at 774. Although the Claims Court declined to apply the doctrine of pendent jurisdiction under the facts of *Watson*, the case can be read for the proposition that pendent jurisdiction is available in Claims Court litigation.

Ancillary jurisdiction is an extension of pendent jurisdiction, which promotes the same goals of judicial economy and fairness, and applies in cases like our own, when a court lacks jurisdiction over one party (DSHA) but the claim against that party is logically related to a claim against another party (the Secretary) over whom the court does have jurisdiction. *Owen Equipment and Erection Co. v. Kroger*, 437 U.S. 365, 377, 98 S.Ct. 2396, 2404–05, 57 L.Ed.2d 274 (1978). Given *Watson's* recognition of pendent jurisdiction, it is arguable that the closely related doctrine of ancillary jurisdiction also applies to Claims Court litigation. At least *Grasso* would so hold.

The plaintiff's claim against DSHA seems to be within the Claims Court's ancillary jurisdiction. The plaintiff's claim against DSHA is logically dependent upon its federal claim. If the Secretary was justified in directing DSHA to withhold plaintiff's housing assistance payments, then DSHA could not be liable to the plaintiff for executing that directive. Thus the success of the plaintiff's claim against DSHA seems to depend on its prevailing against the Secretary.

Moreover, transferring both claims to the Claims Court would promote the goals of ancillary and pendent jurisdiction set out in *Kroger*. Judicial economy and convenience would best be served by trying the two claims together. Since the claims arose out of the same facts, the trials would involve substantially the same evidence. Trying one claim here and the other in the Claims Court would require a duplication of effort on the parties' part, be

a waste of court time, and could result in inconsistent judgments.

Further, transferring both claims to the Claims Court would be fair to the litigants. The expense of trying the case would be reduced for all parties. More importantly, the Claims Court might be the only place the plaintiff can maintain its claim against DSHA. If, as DSHA contends, the Secretary is an indispensable party to this litigation, this Court would be forced to dismiss the case against DSHA once the federal claim is transferred to the Claims Court. It would be extremely unfair if the Claims Court, the only court which has jurisdiction to hear the plaintiff's claim against the Secretary, an indispensable party to its case against DSHA, refused to entertain the case.

Based on the above, the Court finds that the plaintiff's claim against DSHA is arguably within the ancillary jurisdiction of the Claims Court. The law on this issue is unclear and the Court does not reach this conclusion with absolute certainty. However, it need not do so. Once a court is satisfied that a claim ought to be transferred to the Claims Court in the interest of justice, it should transfer the case to the Claims Court and let that court decide whether jurisdiction exists. *Town of No. Bonneville Washington v. United States District Court,* 732 F.2d 747, 751 (9th Cir. 1984). This approach has merit since this Court's conclusions regarding Claims Court jurisdiction are not binding on the Claims Court. The Claims Court must independently decide the limits of its jurisdiction. *Diamond v. United States,* 228 Ct.Cl. 493, 657 F.2d 1194, 1197 (1981), *cert. denied,* 459 U.S. 831, 103 S.Ct. 70, 74 L.Ed.2d 69 (1982). Therefore, since the Court finds that transferring plaintiff's claim against DSHA to the Claims Court is in the interest of justice, it will so transfer that claim under 28 U.S.C. § 1631.

## IV. CONCLUSION

The plaintiff's federal claim is in reality against the United States and thus subject to the doctrine of sovereign immunity. The only applicable waiver of that immunity is the Tucker Act which vests exclusive

jurisdiction over the plaintiff's federal claim in the Claims Court, and that claim will therefore be transferred to the Claims Court. The plaintiff's claim against DSHA is arguably within the Claims Court's ancillary jurisdiction and the Court will transfer that claim to the Claims Court as well in the interest of justice.

An order will be entered in accordance with this Memorandum Opinion.